RAMÍREZ ET AL., DEMANDANTES Y APELANTES, *v.* RAMÍREZ ET AL., DEMANDADOS Y APELADOS.

APELACIÓN procedente de la Corte de Distrito de Mayagüez en pleito sobre filiación y otros extremos.

No. 2267.—Resuelto en mayo 31, 1922.

FILIACIÓN — HIJO NATURAL — RECONOCIMIENTO — CONCUBINATO. — La Ley 11 de Toro no establece diferencia entre los hijos naturales e incluye a los nacidos en concubinato y esa ley tampoco supone que un hijo nacido de padres que vivían juntos públicamente como marido y mujer tiene un estado legal establecido sin la necesidad de una acción de filiación.

ID.—ID.—PRESCRIPCIÓN.—En tanto la demandante funda su derecho al reconocimiento en el concubinato público, no tenía ningún estado civil, y en lo que respecta a cualquier derecho que tuviera por razón de la legislación vigente con anterioridad al año 1911, su acción de filiación ha prescrito.

Los hechos están expresados en la opinión.

Abogado de los apelantes: *Sr. L. Llorens.*

Abogados de los apelados: *Sres. Travieso & Iriarte* y *B. Forés.*

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

María Ramírez de Riera nació en el año 1868 y en su carácter de hija natural estableció una acción de filiación contra los demandados como herederos de su alegado padre natural. La corte inferior declaró con lugar una excepción previa a la demanda por el fundamento de la prescripción en armonía con las varias decisiones de esta corte citadas en los casos de *Castro* v. *Solís,* 19 D. P. R. 677, y *Castro* v. *Solís,* 23 D. P. R. 478. La apelante, sin embargo, en una hábil exposición de las condiciones históricas existentes a la fecha de la promulgación de la Ley 11 de Toro, trata de establecer una diferencia entre los hijos naturales y sostiene que un hijo natural cuyos padres vivían en concubinato público jamás tenía necesidad de establecer una acción de filiación sino que tal hijo natural tenía una condición legal (*status*) semejante a la de un hijo legítimo. Según la apelante solamente cuando un hijo nacía secretamente y el concubinato no era público una acción de filiación era necesaria para establecer el estado legal, y de ahí, arguye la apelante, la interpretación de la Ley 11 de Toro que dice así:

"Y porque no se pueda dudar quales son hijos naturales, ordenamos y mandamos que entonces se digan ser los hijos naturales, quando al tiempo que nascieren o fueren concebidos, sus padres podían casar con sus madres justamente sin dispensación; con tanto que el padre le reconozca por su hijo, puesto que no haya tenido la mujer de quien lo ovo en su casa, ni sea una sola. Ca concurriendo en el hijo las calidades susodichas, mandamos que sea hijo natural."

Conviene llamar la atención a dos particulares: primero que la ley transcrita no habla de concubinato en el sentido de conferir un derecho al reconocimiento, ni que por el contrario esa ley tampoco asume necesariamente que un hijo nacido de padres que vivían juntos públicamente como marido y mujer tiene un estado legal establecido sin necesidad

de una acción de filiación. Prosigue la apelante·a discutir las condiciones existentes en la fecha de Las Siete Partidas y la legislación que hasta entonces existió. No había duda alguna de que entonces y con anterioridad a esa fecha el hijo que podía probar que sus padres vivieron juntos en concubinato público era· un hijo natural y como tal tenía derechos que reclamar de su padre, pero que dicho hijo tenía un estado civil legal establecido, no se infiere necesariamente. La Ley 11 de Toro, podemos repetir, decía que eran necesarias ciertas gestiones para adquirir un estado legal civil, y aún admitiendo que la susodicha ley sólo se refiere a hijos procreados en la casa de un hombre, ello no implica que no fueran necesarias hacer gestiones legales para establecer un estado legal, los hijos nacidos de padres que vivían en concubinato público antes de esa fecha.

La apelante cita un número de tratadistas los cuales, según sostiene, demuestran que un hijo nacido de padres que vivían juntos en concubinato público era un hijo natural y tenía sin más reconocimiento todos los derechos de los hijos naturales. Algunas de las citas más atinentes son tomadas de Arrazola, página 637, tomo 5 de su Enciclopedia, a saber:

"Para acabar de comprender cuan favorablemente miraba el derecho a la barraganía, y el carácter que se le dió, bastará presentar algunas disposiciones respecto a los hijos nacidos de tales uniones. En primer lugar éstos tenían desde luego una filiación· cierta; su padre estaba designado y probado en el mero hecho de ser dados a luz por una mujer que se hallaba ligada por unos vínculos que la ley reconocía y suponían fidelidad mutua; si el matrimonio solemne demostraba quien era el padre de los hijos de bendición, la barraganía demostraba asimismo el padre de los hijos naturales, o como la ley dice, de los hijos de ganancia.

"Fuera de esto hallábanse determinadas las relaciones legales entre padres e hijos de barraganía; así aquellos respondían de los daños que éstos causaran, del mismo modo que sucedía en consecuencia de un matrimonio solemne. Por otra parte los hijos de barragana tenían asegurada su capacidad para la sucesión de su padre y parientes, si bien con ciertas limitaciones, así por los fueros, como

por las leyes generales de Castilla. En fin, fueron las leyes· tan favorables a la barraganía, que el hijo nacido de esta unión de padre hidalgo, no tenía obstáculo alguno para disfrutar de esta misma hidalguía.

"Y con efecto, medios había de acreditar la existencia de la barraganía, y de distinguir la del solemne matrimonio; reducíase a un contrato civil, y como tal se hacía constar, como tal se probaba; el medio más general, mucho más en un contrato de esta naturaleza y del que eran anejos varios particulares, sería indudablemente el de formalizar escritura ante testigos; la intervención de éstos, con el nombre de *'homes bonos'* *'buenos omes'* era de mucha importancia, y se alude a ella como medio probatorio. A veces se consideraba la asistencia de testigos tan eficaz, que de ello pendía que una unión pasara como barraganía, o verdadero matrimonio, si no había otros medios de prueba. Esto es lo único que podemos decir sobre el modo de contraerse y de probarse la barraganía; era una especie de consorcio conyugal, en cuya celebración no intervenía la Iglesia, y por tanto los medios de prueba tenían que ser puramente civiles. A pesar de esto no estaba mal visto contraer semejantes uniones; eran muy frecuentes y generales; autorizadas, consignadas y regidas por las leyes, no se conceptuaban indecorosas, siempre que se respetaran las prohibiciones impuestas por el derecho, y se llenaran los requisitos por él exigidos: la opinión pública y el legislador iban de acuerdo en esta parte, y la barraganía no imprimía nota desfavorable en quienes la habían contraído y la sostenían.

"Más no podían indistintamente todas las personas unirse en barraganía de un modo lícito; el derecho había fijado ciertos impedimentos, ya por razón de vínculos anteriormente contraídos, ya obedeciendo a las consideraciones sociales, ya en fin pagando el debido tributo a los principios de moral y de orden público. El que estaba casado solemnemente no podía unirse públicamente a barragana; los fueros y las leyes antiguas de España nunca pudieron permitir unión tan escandalosa antes bien la aborrecían y la conceptuaban como un delito merecedor de severa pena corporal; en algunos fueros se establecía que si algún hombre casado tenía barragana, ambos fueran 'ligados y fostigados' y las leyes de partida excluyen de la capacidad para tener impunemente barragana al 'embargado de casamiento', disposición que guarda notable conformidad con la dictada muchos siglos antes en el Concilio I de Toledo, de que hemos hablado anteriormente."

Es evidente de acuerdo con esta cita que el descrito hijo natural tenía ciertos derechos, pero no vemos que se haya dicho que tenía el derecho a acudir a una corte en solicitud de una declaración de heredero sin establecer una acción. No vemos que su estado legal civil estaba establecido sin la intervención de las autoridades públicas. Si alguna medida semejante no era necesaria, ¿cómo era posible distinguir entre un hombre que tenía más de una concubina, o cuyo concubinato aparente estaba invalidado por un matrimonio legal existente? Podía ser que los herederos legítimos de una persona nacida tal vez de un matrimonio legítimo anterior se dijera que tenían que probar que un alegado concubinato no era de orden lícito?

Nada tenemos que nos indique además que estos hijos naturales formaban parte de la sucesión legal de un hombre. Los mismos Romanos no reconocieron semejante relación legal civil. Por ejemplo, en las Institutas de Sohm, de la Ley Romana, se dice lo siguiente:

"*Concubinatus* era el nombre que se aplicaba a ciertas relaciones cuasi matrimoniales, las cuales aunque envolvían algunos impedimentos legales eran, sin embargo, reconocidas por la legislación del Imperio (desde Augusto) por constituir a la vez una forma de unión legítima entre un hombre y una mujer para el fin de una permanente y mutua compañía. A una concubina, sin embargo, no se llamaba uxor, ni participaba ella del rango y posición del hombre. Ni tampoco la prole de tal unión (técnicamente llamada '*liberis naturales*') caía bajo la patria potestad de su padre. Un hombre que era casado no podía tener a la vez una concubina. Pues el concubinato, lo mismo que el verdadero matrimonio era por su naturaleza monogamo, y por consiguiente incompatible con cualquiera otra relación de semejante naturaleza."

Por otra parte hay dos tratadistas que tienen un criterio muy diferente. Véase a La Serna en sus comentarios a la ley de Toro, página 514, donde se dice lo siguiente:

"Llámanse naturales los habidos de padres que al tiempo de la concepción o del nacimiento podían casar justamente y sin dispen-

sación, con tal que el padre los reconozca por suyos, aunque no haya tenido en casa la mujer de quien los hubo ni sea una sola: Disposición de las Leyes de Toro que alteró considerablemente el derecho establecido en las de Partida.''

Y Benito Gutiérrez en su tratado sobre la Ley Civil de España, tomo 1, página 585, edición de 1868, al referirse a la Ley de Toro, se expresa así:

"Tampoco es necesario, según ella, que la concubina viva en casa ni sea una sola. No sé qué dudas ha podido ofrecer esta frase, cuando gramaticalmente examinada, si no se entiende así, no tiene sentido: unida con las palabras antecedentes, explicándola según algunos pretenden, como condicional, la versión que resulta es la siguiente: con tanto que el padre lo reconozca por su hijo; con tal que haya tenido la mujer de quien lo hubo en casa, esto ni siquiera es castellano, y sobre ser un defecto gramatical, semejante traducción sería un absurdo jurídico; la Ley de Toro, es correctaria de las Partidas: allí era innecesario reconocer el hijo de la barragana que entraba en la familia con el asentimiento de los parientes y hasta con solemnidades: hoy el reconocimiento es indispensable, porque todo concubinato es unión furtiva; pero mal podrían ir juntas ambas circunstancias cuando si en algún caso pudiera excusarse el reconocimiento debía ser teniendo el varón en casa a la mujer de quien hubo el hijo. Unirla con las palabras que se siguen es también imposible. Si se insiste en que la cláusula sea afirmativa, en lugar de ser negativa, el sentido que arroja es contradictorio, sería un logogrifo. Con tal que haya tenido la mujer en casa, ni sea una sola, esto es lo que resulta y esto es un absurdo. Habría sido una insensatez exigir en el concubinato condiciones que no podría tener hoy que las costumbres le reprueban; relegadas semejantes uniones a la categoría de un vicio, la ley no pudo darle reglas, no pudo mandar que sea una la mujer con quien una persona viva malamente, y no solo no debió exigir, sino que está obligada a evitar que la tenga en casa con escándalo. De advertir es que aún por la ley de partida que autoriza esta especie de contrato jurado, no era tampoco de esencia la cualidad de habitación común requerida por derecho civil, pues como observa Gregorio López en la glosa 7 a la 1ª., tít. XV, si los hijos de barragana que el padre tenía fuera de casa, no eran naturales cuando éstas se entregaban a otros hombres, además de aquél que las tenía por amiga, claro es que sucediendo

lo contrario, si guardaban cierta consecuencia, los hijos podían ser naturales aunque ellas viviesen en casa aparte.

"El artículo más grave es el que se refiere al reconocimiento; son de distinta índole las dificultades que con motivo de este acto pueden ocurrir, ¿el reconocimiento ha de ser voluntario, o puede ser forzoso?, ¿ha de ser expreso, o basta que sea tácito? Llamas en el número 129, dice: 'Este requisito no lo pedía el derecho romano, ni era necesario pues habiendo de vivir la concubina en casa del concubinario, obraba la presunción de que éste era el padre. Como la Ley de Toro extendió el beneficio de la naturalidad a los engendrados de mujeres que los padres tenían fuera de casa, cesó la presunción, y fué necesario en su lugar establecer el reconocimiento del padre.' Por manera que según él, todavía en nuestro tiempo, estando la mujer en casa del padre el reconocimiento dejaría de ser preciso. ¿Autoriza la ley semejante presunción? De ninguna manera. Aunque son tantos y tantos sabios los escritores que esto afirman, según puede verse en Gómez número 2, del com. se nos figura que es demasiado favorable esa presunción, y ni puede ni debe permitirla la ley. Esa presunción rige en el matrimonio, ¿pero hay comparación entre un lazo solemne y una unión libre? ¿entre la santidad de los deberes de una buena esposa, y la facilidad de vida y de costumbre de una manceba? El reconocimiento es siempre indispensable: si ha de ser voluntario, si puede arrancarse por fuerza, no tenemos que decirlo aquí, cuestión es esta que reservamos intacta para más adelante; conviene, sin embargo, recordar que si el concubinato es un acto libre, las consecuencias de la paternidad pueden ser forzosas; contínuamente se están viendo querellas de estupro, en las cuales, probado el delito, manda el tribunal si ha habido prole, que el reo la reconozca por suya, supliendo con su sentencia el reconocimiento.

"Por lo demás, la ley no exige ni exigió nunca que éste sea expreso, basta que sea presunto; sabemos el peligro de estas presunciones, la falibilidad de los medios, aún los que parecen más seguros, recordamos lo mucho que se ha escrito y declamado en contra de ciertos indicios y de ciertas conjeturas, pero sobre todas esas razones más o menos atendibles, está la ley, está la jurisprudencia. El Tribunal Supremo ha declarado que la ley 11 de Toro no exige que el reconocimiento del padre sea expreso, ni antes de ella lo exigía otra alguna, porque la 7ª., tít. XXII, lib. IV del Fuero Real, tiene por objeto en la fórmula que sanciona, como lo patentizan sus mismas

palabras, no el reconocimiento, sino la adopción de los hijos natu-
rales, ora estén ya reconocidos como tales a la sazón, ora no lo estén,
(Sent. de 8 de octubre de 1855). De conformidad con esta senten-
cia se declaró por otra de 10 de mayo 1860 que no vale citar las
leyes de Partida, pues las cuestiones sobre declaración de hijos na-
turales, deben ser resueltas con arreglo a la Ley 11 de Toro, o sea
1ª., tít. V, Libro X de la Nov. Rec.''

Asimismo "puesto que" se define como "aunque" en el
Diccionario de Salvat. Somos de opinión, por tanto, de que
las palabras "puesto que no haya tenido la mujer de quien
lo ovo en su casa", como han sido expresadas en el antiguo
Castellano, quieren decir, haya o no tenido el padre a la mu-
jer en su casa. En el caso de *Castro* v. *Solís,* 19 D. P. R.
677, dimos esta interpretación a la Ley 11 de Toro, y no
vemos que exista razón suficiente para variar nuestra de-
cisión. En verdad que la misma parte que era demandante
en el caso de *Castro* v. *Solís,* había establecido otra demanda
y fué promovida la excepción de cosa juzgada. En el se-
gundo caso se levantó el punto de no haber quedado real-
mente resuelta la cuestión de prescripción en el primer caso
por ser *obiter dictum,* y la corte entonces citando el razona-
miento del primer caso de *Castro* v. *Solís,* resolvió que la
acción, sin embargo, había prescrito. 23 D. P. R. 478.

En el caso de *Castro* v. *Solís,* dijimos que era necesaria
una acción de filiación aún antes de la citada ley de Toro.
Nos sentimos obligados a declarar que en tanto la deman-
dante funda su derecho en el concubinato público, ella no
tenía ningún estado legal civil, y que con respecto a cual-
quier derecho que tuviera por virtud de la legislación vigente
con anterioridad al año 1911, su acción de filiación había
prescrito.

En 26 de enero de 1865, la Corte Suprema de España
falló un caso en el cual un hijo nacido de una concubina que
vivía en la casa del padre natural estableció una acción de
filiación en su carácter de hijo natural. En casación alegó

el apelante que como este niño había nacido de una concubina que vivía en la casa del padre no era necesario ningún reconocimiento y por tanto que la acción se establecía en violación de la Ley 11 de Toro y varias leyes de Partidas que citó.   En otras palabras, que solo los hijos nacidos de mujeres que se tengan fuera de la casa del padre podían ser considerados en la clase de hijos naturales que tenían derecho a iniciar una acción de reconocimiento.   La corte resolvió que la Ley 11 de Toro era aplicable a los hechos del caso y que no era necesario considerar las citadas leyes de Partidas.

Expresa, sin embargo, la apelante que es tal vez ahora que por primera vez aparece declarado su derecho por la ley de 1911.   Un estatuto casi siempre mira hacia adelante a menos que prevalezca una intención diferente.   Debe presumirse que no fué la intención de la Legislatura que los hijos nacidos con anterioridad al año 1911 debían quedar comprendidos en las disposiciones de esa ley.   Por lo general hemos resuelto que la ley que ha de aplicarse es la vigente al ocurrir el nacimiento del hijo.   Véase además la cuarta disposición transitoria del Código Civil como ha sido interpretada por nosotros en el caso de *Gual* v. *Bonafoux,* 15 D. P. R. 559.   La idea de la apelante de haber estado ella en el estado constante de hija natural se funda en la misma suposición de que no era necesario ningún reconocimiento.

Si entendemos a la apelante creemos que lo que sostiene es que como la cuestión que consideramos surgió a virtud de excepción previa a la demanda y como en dicha demanda ella expresa que ha estado en posesión contínua del estado de hija natural, que esto debe tenerse por cierto.   Pero en una excepción previa solo se admite la verdad de los hechos que han sido bien alegados.   La apelante debe exponer los hechos que le confieren el estado.   De lo contrario no establece sino su conclusión de derecho.   Pero en la demanda ante nos los hechos de cada alegación guardan entre sí rela-

ción con la primera alegación y en ellos se establece enteramente la naturaleza de la reclamación de su derecho como ya ha sido considerado por nosotros.

Creemos que resulta claro que los demandados contra quienes fué establecida esta acción tenían derecho a alegar la prescripción aún cuando son parientes colaterales. Ellos sucedieron en todos los derechos del padre de la demandante.

Debe confirmarse la sentencia apelada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente del Toro y Asociado Aldrey.

El Juez Asociado Sr. Hutchison firmó: "Conforme con la sentencia."

El Juez Asociado Sr. Franco Soto no tomó parte en la vista de este caso.