EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ARTURO PÉREZ, acusado y apelante.

Núm. 7829.—*Sometido:* Julio 13, 1939. *Resuelto:* Noviembre 30, 1939.

*Benjamín Ortiz* y *R. Fernández Garzot,* abogados del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Inocencia Peña Cruz, vecina de Fajardo, denunció ante la Corte Municipal del Distrito Municipal de su residencia·

a Arturo Pérez, por un delito de abandono de menores cometido como sigue:

"... el referido acusado Arturo Pérez allí y entonces, ilegal, voluntaria y maliciosamente y sin excusa legal alguna, ha dejado de pasarle los indispensables alimentos, medicinas y vestuarios a sus hijos naturales William Peña de 8 años y Luz Delia Peña de 5 años respectivamente, habidos entre la aquí denunciante y el acusado Arturo Pérez."

Condenado el denunciado por la corte municipal, apeló para ante la del distrito, Humacao, y celebrado el nuevo juicio que ordena la ley, también fué condenado, apelando entonces para ante este tribunal.

La sentencia de la corte de distrito se dictó en los siguientes términos:

"La Corte, vista la denuncia, y oída la contestación del acusado y apreciada la prueba practicada, declara a Arturo Pérez, Policía Insular, culpable del delito de Abandono y Descuido de Menores y le impone la pena de cien dólares de multa y en defecto de pago a cumplir un día de cárcel por cada dólar que dejare de satisfacer y las costas; dejando en suspenso esta sentencia mientras el acusado pase a sus hijos William y Luz Delia Peña, la suma de veinte dólares mensuales por concepto de pensión alimenticia, que el acusado deberá depositar en la Secretaría de esta Corte por meses anticipados a disposición de sus citados hijos.

"Y se ordena que el sentenciado, si no cumpliere con los términos de la condición de cuota alimenticia, sea conducido de esta Corte de Justicia, si no satisficiere el importe de la multa impuesta, a la Cárcel Común del Distrito a donde será entregado al Jefe de aquel establecimiento penal para que sea en el mismo recluído por el término señalado en esta sentencia."

En su alegato el apelante imputa a la corte ocho errores, cometidos, el primero, al apreciar la prueba; el segundo al resolver que la paternidad del acusado quedó establecida; el tercero, al no resolver que la prueba era suficiente para levantar por lo menos una duda razonable en cuanto a la paternidad; el cuarto, al permitir que se presentara prueba tendiente a establecer la filiación de los supuestos hijos

adulterinos del acusado; el quinto, al permitir a la testigo Inocencia Peña que declarase sobre sus supuestas relaciones sexuales con el acusado; el sexto, al no permitir a los testigos Martínez y González que declarasen sobre la reputación del acusado en la comunidad; el séptimo, al no permitir prueba sobre el parecido o falta de parecido entre el acusado y sus supuestos hijos y el octavo, al dictar su sentencia condenando al acusado.

▇ Por los errores cuarto y quinto se suscita la misma cuestión que fué levantada en los casos del *Pueblo* v. *Rohena,* 52 D.P.R. 313; *Pueblo* v. *López,* 54 D.P.R. 294, y *Pueblo* v. *Rotger* decidido en quince de junio último (ante, pág. 139), a saber, que tratándose de hijos adulterinos es necesario demostrar su previo reconocimiento sin que pueda ese hecho acreditarse en la causa que contra el padre se siga por abandono de menores.

En los indicados casos se resolvió, copiando el resumen del segundo o sea del de *Pueblo* v. *López,* 54 D.P.R. 294:

"En proceso por abandono de menores, tanto la declaración de la madre sobre sus relaciones con el padre de los menores como las de otros testigos a ese efecto, son admisibles en evidencia."

"El hecho de la paternidad, o sea la relación de padre e hijo que pueda existir entre el acusado y el menor de quien se trate, puede ser establecido dentro del proceso por abandono de menores (*Pueblo* v. *Rohena,* 52:313, *seguido*)."

Ningún nuevo argumento se presenta que requiera nueva consideración. Bastará, pues, referirnos a la jurisprudencia ya sentada para concluir que los dichos errores no existen.

▇ Los errores sexto y séptimo se refieren a la práctica de la prueba.

Argumentando el sexto se limita el apelante a decir que la corte no le permitió presentar prueba de su buena reputación en la comunidad y a citar a Wigmore, secciones 55, 59 y 1610 de su obra sobre Evidencia.

Los autos muestran que llamado a declarar Miguel Martínez, Jefe de Distrito de la Policía Insular se le pre-

guntó sobre la reputación que tenía el acusado en la comunidad y en cuanto a castidad, que se opuso el fiscal y que la corte sostuvo su oposición manifestando "que era de presumirse que el acusado tenía buena conducta en todo momento."

Aceptando que el error se hubiera cometido, no encontramos que exista perjuicio porque los autos también muestran que no obstante la oposición, es lo cierto que el testigo llegó a contestar una de las varias preguntas que la defensa le hizo en el sentido de no tener conocimiento de que el acusado tuviera en algún momento relaciones ilícitas con alguna mujer.

Lo ocurrido en relación con el señalamiento séptimo fué así:

"Defensa: Como última evidencia, vamos a solicitar de la Corte que haga un parangón entre el acusado y los hijos de la querellante, para demostrar que no hay ningún parecido entre ellos.

"Fiscal: Nos oponemos. . . .

"Sr. Juez: ¿Fundamento?

"Fiscal: Que no es evidencia, en un procedimiento de esta naturaleza, probar las relaciones con el acusado, al tiempo de la concepción, con la madre de los hijos que se alegan ser del acusado. Es improcedente el examen que solicita la defensa.

"Defensa: Nosotros hemos atacado el hecho de la paternidad del acusado. . . .

"Sr. Juez: La situación de la Corte es la siguiente: traiga aquí los niños que solicita la defensa. . . .

"Defensa: Para ver si se evidencia el parecido o falta de parecido entre los niños y el acusado. . . .

"Sr. Juez: La Corte considera que no estaría en condiciones de determinar las características que pudieran existir entre los hijos y los padres. Estas características varían de acuerdo a la edad, el desarrollo, a veces enfermedades, a veces defectos congénitos y cree la Corte que no estaría en condiciones de poder determinar lo que solicita la defensa. Podría llevar a la Corte a la apreciación de que se parezcan o podría llevar a la Corte a la apreciación de que no se parezcan. . . . Considera el Tribunal, que a veces un hijo se parece a la madre y que no se parece al padre. . S. S. puede traer prueba de si se parecen o no, pero la Corte considera que no está

"La pregunta ha sido a menudo suscitada de si puede propia-
lesivo a los derechos del acusado o lesivo a los derechos de El Pueblo.
"Defensa: Tomamos excepción. . . ."

La admisión o exclusión de esta clase de prueba ha dado
lugar a las más variadas decisiones.

Resumiendo la jurisprudencia sobre el particular, Ruling
Case Law en su tratado sobre hijos ilegítimos, dice:

"La pregunta ha sido a menudo suscitada de si puede propia-
mente exhibirse un niño al jurado para ponerlo en posición de juzgar;
comparando su apariencia, semblante y facciones con las del acu-
sado, si puede deducirse legítimamente una inferencia sobre su
paternidad. Aun cuando las cortes no estén en armonía, la mejor
regla parece ser que, por lo menos, en casos de infantes de tierna
edad, es impropio exhibirlos, por el fundamento de que tal evidencia
es demasiado vaga, incierta y quimérica, y que, de ser seguida, esta-
blecería no sólo una regla poco sabia, si que también peligrosa e
insegura; y que aun cuando sea un conocido hecho fisiológico que las
peculiaridades de la forma, facciones y las características personales
a menudo se trasmiten del padre al hijo, es también cierto y cuestión
de conocimiento común, que durante las primeras semanas, y a
veces meses, de la existencia de un niño, tiene esa peculiar falta de
madurez en sus facciones que lo caracterizan como un infante, y que
sus facciones cambian mucho y a menudo durante ese período. El
parecido puede fácilmente imaginarse. Y así sucede muchas veces.
A menudo tales parecidos son quiméricos o imaginarios. Lo que
puede considerarse parecido por uno puede pasar desapercibido por
otro que tenga el mismo conocimiento de las partes entre quienes
existe la supuesta semejanza. La regla que la exhibición de un
infante es impropia ha sido aplicada en el caso de un niño de seis
semanas, de tres meses, de nueve meses, y uno como de un año de
edad. Sin embargo, hay un considerable número de autoridades que
favorecen la regla que un niño puede exhibirse al jurado como
prueba de la alegada paternidad, y generalmente las autoridades
han expuesto la regla sin intimar limitaciones afectas por la edad
del niño. La razón para la regla es que el peso que debe darse al
testimonio corresponde al jurado y que su debilidad (de la prueba)
o falta de certeza no ofrece fundamento para su exclusión. Una
regla que ha recibido algún apoyo es la de que puede exhibirse al
jurado un niño ilegítimo si éste es de edad apropiada, como por
ejemplo si tiene dos años. En tal caso el niño tiene edad suficiente

para que haya desaparecido la falta de madurez de sus facciones que lo caracterizan como un infante. Si la exhibición al jurado se efectúa, el hecho de que el abogado del demandante comente sobre el parecido del niño con el acusado es propio, especialmente cuando la corte instruye al jurado que debe ignorar los comentarios si no nota el parecido. Generalmente parece aceptarse que un niño ilegítimo puede exhibirse al jurado cuando se trata de cuestiones de raza o color de la piel, porque es bien sabido que hay marcadas diferencias, físicas y externas, entre las diversas razas humanas, lo que permite a un hombre de inteligencia y observación común juzgar si pertenecen a una u otra raza. En jurisdicciones donde el demandante puede exhibir un niño ilegítimo con el objeto de demostrar su parecido con el acusado, debe también permitirse à éste exhibirlo con el propósito de demostrar que no tiene parecido con él o para demostrar el parecido del niño con otra persona que tuvo oportunidad de haber tenido relaciones carnales con la madre. La mejor regla y la sostenida por el peso de las autoridades es que el parecido o falta de parecido de un niño ilegítimo con el acusado no puede demostrarse por prueba testifical, si no se exhibe el niño, pues esto es prueba pericial; y esta regla es especialmente aplicable cuando se trata de introducir evidencia respecto al color del pelo y ojos con el propósito de demostrar su parecido con los del acusado, pues la experiencia común demuestra que en la misma familia los niños con frecuencia tienen pelo y ojos de distinto color, y sería una doctrina peligrosa permitir que se impugnara o se probara la paternidad de un niño comparando el color del pelo y ojos con los del supuesto padre. Irrespectivamente de si puede exhibirse el niño ilegítimo al jurado o si se puede admitir prueba testifical respecto a su parecido o falta de parecido con el acusado, la mera presencia del niño en la sala del tribunal no constituye error perjudicial al acusado, cuando el menor no se ha exhibido ni se ha propuesto mostrársele al jurado, y el letrado al dirigirse a éste no hace mención del niño ni a su presencia en corte. Tampoco es motivo de objeción que se permita que el menor cuya paternidad está en juicio permanezca en la falda de su madre mientras ella es examinada, por lo menos cuando la corte advierte al jurado que no debe considerar o discutir ninguna supuesta o imaginaria semejanza o desemejanza entre el menor y el acusado; y no se ofrece el niño como prueba ni se le exhibe al jurado durante los informes.'' 3 R.C.L. 764.

Y en American Jurisprudence, encontramos:

"En general, en aquellos casos en que pueda admitirse prueba de parecido para demostrar la paternidad estableciendo así la legitimidad o ilegitimidad del niño, las partes negando tal paternidad pueden demostrar que el niño no se parece al alegado padre, o que se parece a otro hombre con quien la madre pudo haber tenido relaciones sexuales ilícitas."

". . . . hay un decidido conflicto de autoridades en cuanto a la admisibilidad de prueba de parecido en relación con la cuestión de legitimidad, las decisiones, pues, cubren desde la admisión de tal prueba sin cualificación alguna hasta su total exclusión." 7 Am. Jur. 649.

Consúltese además 10 C.J.S. 92, 40 A.L.R. 99 y 119 y 95 A.L.R. 317 y 319.

Si examinamos la resolución de la corte a la luz de las autoridades citadas, bien podría concluirse que no debió rehusar hacer la observación de si los niños se parecían o no al alegado padre, ya que estaba actuando sin jurado, esto es, como juez de los hechos y la ley.

Pero si bien la corte declaró que "no estaría en condiciones de poder determinar lo que solicita la defensa", esto es, el parecido o la falta de parecido, "porque puede incurrir en algún error lesivo a los derechos del acusado o lesivo a los derechos de El Pueblo", es lo cierto que indicó además a la defensa que podía "traer prueba de si se parecen o no" y nada hizo la defensa, limitándose a tomar excepción, sin que deba perderse de vista que el acusado no sólo estaba negando la paternidad si que tratando de probar que la madre de los menores había tenido relaciones con otros hombres, dando el nombre de éstos, al tiempo probable de su concepción.

Habiendo en consideración todas esas circunstancias y considerando además que es un hecho cierto que la corte tuvo ante sí al alegado padre y a los hijos y que aunque éstos no se le parecieran llegó—como pudo llegar a virtud de la otra prueba—a la conclusión de que era verdad la ale-

gación, creemos que el error que pudiera haberse cometido no fué perjudicial.

A lo más que puede llegarse es a establecer el principio de que la prueba del parecido o del no parecido es admisible en propios casos para ser apreciada por el juzgador—corte o jurado—como un elemento a considerar que no es por sí solo decisivo.

Los restantes errores señalados van todos al peso de la evidencia y son los que se argumentan con más fuerza en el alegato del apelante.

Al terminar la práctica de la prueba, el juez sentenciador se expresó así:

"En este caso, se formuló por El Pueblo de Puerto Rico una denuncia contra Arturo Pérez, Policía Insular, miembro de uno de los cuerpos que más obligación tiene de acatamiento y respeto a las leyes vigentes en nuestro país, por un delito de abandono y descuido de menores, mediante denuncia jurada por Inocencia Peña ante la Corte Municipal de Fajardo.

"La Corte Municipal de Fajardo, vió este caso y dictó sentencia contra este ciudadano, condenándolo a sufrir una pena de treinta (30) días de cárcel en la Cárcel de Distrito de Humacao.

"Las leyes en un país civilizado y culto, tienen que ser acatadas por todos los ciudadanos. Los ciudadanos, no importa la posición que ocupen en la maquinaria gubernamental, tienen más obligación que nadie para que las leyes en nuestro país se cumplan. Tomar ventajas de la posición que los ciudadanos ocupen, mover resortes para que las leyes se burlen, es menoscabar el prestigio de las leyes y es interrumpir la administración de la justicia. Actuar de esa manera es derrumbar los cimientos sobre los cuales deben levantarse la seguridad pública y la garantía de este pueblo. El espectáculo en este aspecto, de nuestro país, ha sido doloroso. Los mismos obligados a cumplir con las leyes, a veces toman ventajas de su posición para burlar las mismas socavando sus cimientos hasta el extremo de que el pueblo, si no ha perdido completamente la confianza en la administración de la justicia, está a punto de perderla. Y creo que la principal responsable de ese estado del pueblo y de ese sentimiento del pueblo, es la maquinaria misma, que realmente no responde a veces al alto compromiso contraído con la sociedad.

"La Corte lamenta profundamente que se traigan ante un Tribunal a miembros de la uniformada, de la Policía Insular, denunciados por el delito de abandono y descuido de menores. Es doloroso ver estos espectáculos, y doloroso para el Juez que tenga que resolver casos de esta naturaleza, porque desearía que no vinieran; pero las leyes, como ha dicho la Corte previamente, se hicieron para cumplirlas en todo momento y para que todo ciudadano ofreciera acatamiento y respeto a las mismas, y especialmente los que por juramento están más comprometidos con la sociedad al acatamiento y al respeto y al cumplimiento de las leyes en nuestro país.

"La Corte ha oído la prueba de El Pueblo en este caso. Ha oído la declaración de esta mujer que declaró que vivía en Naguabo, que tuvo hijos de otros hombres, que conoció a este policía insular, que empezó a establecer relaciones maritales con él en Naguabo, y que más tarde del pueblo donde ella vivía, donde ella había tenido otros hombres con los cuales había tenido hijos, más tarde, muchos días después, al ser trasladado este policía al vecino pueblo de Fajardo, se trasladó ella a vivir a Fajardo, un pueblo en donde ella no había vivido. ¿Qué móviles la llevaron allí? ¿Cuál fué la causa de su traslado de Naguabo a Fajardo? La Corte opina y ha llegado a la conclusión que fueron las relaciones maritales existentes entre este policía insular y esta mujer. Allí continuaron, opina la Corte, sus relaciones maritales y ya cuando fué allí, cree la Corte firmemente, que ella llevaba en su vientre un hijo de este ciudadano, que a la luz de las cosas naturales de la vida no es un delito, pero que es delito abandonarlo y no mantenerlo, según la sociedad exige; y allí volvieron ellos a tener otro hijo. Después tenemos la declaración de esta comadrona, que por la forma en que ha declarado, le ofrece a este Tribunal toda la credibilidad que le merece el testigo que, bajo la solemnidad de un juramento, viene ante un Tribunal a decir la verdad. Declaró esta comadrona que asistió a esta señora, que este ciudadano estuvo allí, que el tratamiento que le daba él a los hijos era el de padre para hijos. Declaró otro ciudadano que es compadre de este policía, que fué quien le echó el agua a uno de los hijos, costumbre muy antigua entre nuestra gente cuando un niño recién nacido va a morir y no puede llevarse a la iglesia, se llama a la persona de más confianza o a cualquiera persona para que le eche el agua, estableciéndose así vínculos sagrados entre la persona que le echa el agua y los padres, y declaró también que estuvo allí y le echó el agua y estableció relaciones sagradas y veía a este policía que trataba a estos dos niños como hijos.

"Declaró la querellante también, que después fué, cuando el policía fué trasladado a Patillas, que vino el rompimiento entre ellos. Ya la ausencia estableció cierta situación contraria a los menores por parte de este policía y dice ella que entonces no le daba los alimentos. Vino entonces la conducta de ella, vino el ejercicio del derecho que tiene toda mujer que tiene un hijo de cualquier hombre. Todo hombre que tiene un hijo, tiene la obligación de mantenerlo. La legislación moderna en todo pueblo avanzado, tiene que hacer desaparecer la irritante diferencia entre las categorías de hijos, establecidas por cánones antiguos, de hijos legítimos, hijos ilegítimos, hijos adulterinos, hijos naturales. . . . En este pueblo, esta clase de legislación tiene que desaparecer de nuestros códigos, para que se establezca la igualdad entre todos los hijos. Todos los hijos deben ser iguales; deben tener, a la luz del derecho, iguales oportunidades e iguales privilegios. Día llegará en que la sociedad haga desaparecer de sus códigos la irritante denominación de hijos adulterinos, hijos naturales e hijos ilegítimos. Sin embargo, todavía existe en nuestro Código Civil, pero nuestro Código le da derecho a aquellos hijos adulterinos, a tener por lo menos, alimentos de sus padres.

"La Corte opina que, por la forma en que han declarado los testigos de descargo, no le merecen crédito alguno. Chóferes de carros públicos, dueños de puestos de carnes, dueños de cafetines, por el estilo. La Corte opina que han venido a este Tribunal, más o menos, por el interés natural de las circunstancias en que se agitan y se mueven en sus relaciones con los policías, y por la forma en que han declarado, no le merecen a este Juez ningún crédito. Cree que todos estos testigos no han venido a hacer una relación verdad de lo que ha sucedido en este caso, y la Corte le da más crédito a los testigos presentados por El Pueblo.

"La Corte considera que, los hechos están en contra del acusado y le condena a pagar una multa de cien dólares ($100.00) o a cumplir un día de cárcel por cada dólar que dejare de satisfacer. El imperio de la ley hay que acatarlo."

Hemos leído la evidencia. Hemos tomado en consideración el análisis que de ella hace en su alegato el ilustrado abogado del apelante y sus consideraciones alrededor de la misma y sólo podemos concluir que se trata de un caso de prueba contradictoria en el que creída la de cargo precisa reconocer que contiene elementos suficientes para un fallo

,condenatorio, sin que el juez viniera obligado a dudar razo-nablemente de la paternidad imputada al acusado por virtud .de las declaraciones de los otros testigos acerca de las rela-,ciones de la madre denunciante con otros hombres o porque .los hijos no se parecieran al padre.

Tampoco creemos que deba llegarse a la conclusión de .que el juez estaba prejuiciado en contra del acusado y a la de que sus manifestaciones anulan su sentencia. Quizá habló más de lo necesario, podrá estarse más o menos conforme .con sus teorías, pero nada de lo por él expuesto es suficiente para justificar por parte de esta corte la adopción de las .conclusiones a que llega la defensa en los señalamientos de error que estamos considerando.

*Debe declararse el recurso sin lugar y confirmarse la sentencia.*

El Juez Asociado Sr. Wolf disintió.*

El Juez Asociado Sr. Travieso no intervino.