MARÍA FIGUEROA FUENTES, a nombre y en representación de su hija menor MIGDALIA FIGUEROA, demandante y apelada, *v.* TELESFORO DÍAZ, demandado y apelante.

Número 10485.

*Sometido:* 2 de febrero de 1953. *Resuelto:* 30 de junio de 1953.

164

*Manuel Cruz Horta,* abogado del apelante; *Ernesto Juan Fonfrías* y *Santiago Polanco Abréu,* abogados de la apelada.

Opinión del JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ en la cual concurre el JUEZ ASOCIADO SEÑOR BELAVAL.

El 25 de julio de 1952 se dió vida en América al más bello y humano de los postulados de justicia social a que puede aspirar la conciencia democrática de un pueblo: a la igualdad de la cuna ante la ley. Las cadenas que en nuestra legislación aún ataban el destino de los hijos nacidos fuera de matrimonio al discrimen de la inferioridad jurídica y al oprobio de la indignidad social—y que en buena interpretación de ley y en buena justicia hubieran podido aflojarse en parte en *Vargas* v. *Jusino,* 71 D.P.R. 389, op. dis., pág. 396—saltaron en pedazos al impacto de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico,[1] cuya promulgación derogó *ipso jure*[2] en cuanto

---

[1] La Sección 1 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico—Carta de Derechos—dispone: "La dignidad del ser humano es inviolable. *Todos los hombres son iguales ante la ley. No podrá establecerse discrimen alguno por motivo de* raza, color, sexo, *nacimiento,* origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el *sistema de instrucción pública encarnarán estos principios de esencial igualdad humana."* (Bastardillas nuestras.)

Según se expresa en el Informe de la Comisión de Carta de Derechos a la Convención Constituyente, sometido el 14 de diciembre de 1951, "El propósito de esta sección es fijar claramente *como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial* de todas las personas dentro de nuestro sistema constitucional. La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño. En cuanto fuera menester nuestra organización legal queda robustecida por la pre-

a los hijos nacidos en, o con posterioridad a dicha fecha, los preceptos del Código Civil y de las demás leyes que en una

---

sente disposición constitucional, a la vez que obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto." La prohibición específica de discrimen por razón de *nacimiento,* según dicho informe, "Se propone *eliminar el estigma jurídico en contra de los hijos habidos fuera de matrimonio.* Se coloca *a todos los hijos* respecto de sus padres y respecto del orden jurídico *en igualdad de derechos.* Las uniones ilícitas pueden y deben estar prohibidas y esta disposición tendrá como una de sus consecuencias el desalentarlas. *Pero el fruto inocente de ellas, debe advenir al mundo libre de descalificaciones o de inferioridades jurídicas.* Así lo exige *el principio de la responsabilidad individual, con arreglo a la cual nadie es culpable por los actos que él mismo no realiza. Aunque la legislación actual ya cubre en casi su totalidad* lo aquí dispuesto, será menester nueva legislación. A los fines de herencias y propiedades las modificaciones resultantes de esta sección no deberán ser retroactivas a nacimientos ocurridos antes de su vigencia." (Bastardillas nuestras.)

(²) Sobre el efecto jurídico de la Sección 1 del Artículo II de la Constitución, el Presidente de la Comisión de Carta de Derechos de la Convención Constituyente, Sr. Jaime Benítez, se expresó así ante dicha Convención, en los debates que sobre el informe de la Comisión tuvieron lugar el día 2 de enero de 1952:

"Sr. Benítez: Más adelante en las líneas quinta, sexta y séptima, se establece que 'tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana', y lo que se ha establecido aquí son *ciertos principios básicos y esenciales que tienen fuerza 'exproprio-vigore',* pero que *además de tener fuerza por su propio vigor* habrán de requerir implementación de dos clases, educativa y jurídica. En lo que toca a la educativa, ya hay aquí un mandato al sistema de instrucción pública que habrá de respetar estos básicos principios. En lo que respecta al sistema jurídico y en esto se refiere a la totalidad de la estructura legal del país, *se subraya la inconstitucionalidad de todo favoritismo.* Y todo reconocimiento o distinción habrá de estar motivado por mérito, por virtud, por esfuerzo, por talento. En lo que toca a qué es lo que se quiere decir con origen social, que no importa la extracción de la persona, su situación económica, su condición en la comunidad, todos los puertorriqueños y todas las personas sujetas a las leyes de Puerto Rico son iguales ante nuestras leyes si se aprueba esta disposición y cualquier intento de hacer discrimen en favor o en contra de uno de ellos es ilegal." (Bastardillas nuestras.) Diario de Sesiones, Convención Constituyente de Puerto Rico, pág. 524.

No ocurrió así en España con la aprobación, el 9 de diciembre de 1931, de la Constitución de la desaparecida República, cuyo precepto meramente "programático", contenido en su artículo 43, al efecto de que "Las leyes civiles regularán la investigación de la paternidad", no tuvo el efecto de derogar ni interrumpir *ipso jure* los del Código Civil relativos a la materia de filiación. Sentencias del Tribunal Supremo de España de 11 de marzo de 1940 y de 29 de enero de 1935. El citado artículo 43 contiene, además, los siguientes preceptos relativos a las obli-

u otra forma establecían clases y categorías de hijos, por razón de nacimiento.([3])

. .Aunque este caso no se rige por el estado de derecho que dimana del anterior precepto constitucional, y sí por las relaciones jurídicas que se derivan de la legislación vigente a la fecha de nacimiento de la menor demandante, 19 de diciembre de 1948—principalmente la Ley núm. 229 de 12 de mayo de 1942 ((1) pág. 1297), enmendada por la núm. 243 de 12 de mayo de 1945 (pág. 815)—no debemos olvidar, al fijar el alcance y efectos jurídicos de dicha ley, que la dignidad del ser humano, por el mérito intrínseco de sus propios valores éticos, no debe depender, para que se exalte y consagre por los tribunales, de la existencia de una disposición de ley declarativa de esa norma de valoración de los derechos del hombre. El principio de la dignificación del ser humano está presente en la Ley 229, dentro de su limitada esfera, aunque no lo digan expresamente sus palabras.([4])

Estoy conforme con la confirmación de la sentencia ape-

---

gaciones de los padres para con sus hijos y a la constancia de la legitimidad o ilegitimidad de éstos:

"Los padres están obligados a alimentar, asistir, educar e instruir a sus hijos. El Estado velará por el cumplimiento de estos deberes y se obliga subsidiariamente a su ejecución.

. "Los padres tienen para con los hijos habidos fuera del matrimonio los mismos deberes que respecto de los nacidos en él.

. "No podrá consignarse declaración alguna sobre la legitimidad o ilegitimidad de los nacimientos ni sobre el estado civil de los padres en las actas de inscripción ni en filiación alguna." Constitución de la República Española, Enciclopedia Jurídica Española, Apéndice de 1931, Primera Edición, págs. 250, 255.

([3]) Establecida en principio la igualdad de derechos de los hijos por nuestra Constitución—ley fundamental del Estado—se aprobó el 20 de agosto de 1952 ((2) pág. 201) la Ley núm. 17 "Para establecer la igualdad de derechos de los hijos", con efecto retroactivo al 25 de julio del mismo año.

. ([4]) Así parece haberlo entendido la Comisión de Carta de Derechos de la Convención Constituyente, al afirmar, véase nota 1, que "la legislación actual ya cubre en casi su totalidad" lo dispuesto sobre la prohibición de discrimen por razón de nacimiento. Claro está, faltaba entonces eliminar la inferioridad jurídica de los hijos nacidos fuera de matrimonio, . como la Ley 229 ya lo había hecho en cuanto a los ilegítimos no naturales con relación a los naturales.

lada aunque por motivos distintos a los expuestos en la opinión del Juez Asociado Sr. Ortiz. Estoy conforme también con su afirmación de que "el propósito esencial del legislador al aprobar la sección 1 de la citada Ley 229 de 1942 [fué] el de eliminar cualquier posible diferencia entre hijos naturales y adulterinos nacidos con posterioridad a la vigencia de la ley". No creo, sinembargo, que dicha opinión dé "cabal expresión al justo sentido del derecho humano que inspira la legislación que nos ocupa", *Vargas* v. *Jusino,* supra, op. dis. pág. 397, al someter las acciones filiatorias bajo la Ley 229 a los moldes estrechos del artículo 125 del Código Civil, ed. 1930,([5]) ni que exponga, de otro lado, una tesis jurídica racional al pasar por alto—en la valoración de los elementos de prueba sobre *posesión continua de estado*—el requisito de *continuidad* en dicha posesión. Es por eso que paso a consignar separadamente las razones en que fundo mi voto confirmatorio.

■■ La presente acción se ejercita por la demandante en su carácter de hija *natural* del demandado, según el valor jurídico que a dicho término fijó la sección 1 de la Ley 229, supra, que dispone: "Serán hijos naturales todos los hijos nacidos fuera de matrimonio con posterioridad a la fecha de vigencia de esta ley, independientemente de que sus padres hubieren podido o no contraer matrimonio al tiempo de la

---

([5]) Dicho artículo en lo pertinente dispone:

"Son hijos naturales los nacidos, fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos hubieran podido casarse, sin dispensa o con ella.

"El hijo natural puede ser reconocido por el padre o la madre conjuntamente, o por uno solo de ellos, en el acta de nacimiento, o en otro documento público.

"El padre está obligado a reconocer al hijo natural:

"1. Cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad. .

"2. Cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia.

"3. Cuando la madre fué conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo.

"4. Cuando el hijo pueda presentar cualquier prueba auténtica de su paternidad. . . . "

concepción de dichos hijos. Estos hijos quedarán legitimados por el subsiguiente matrimonio de sus padres entre sí." Contrario al criterio rígido que en la determinación del derecho a la filiación de estos nuevos hijos "naturales" muestra la referida opinión, es mi criterio que el artículo 125 del Código Civil ha quedado modificado sustancialmente por el impacto, y desde la vigencia, de la Ley 229, la cual "puede considerarse como una ley de bases que requiere detallado y específico desarrollo en diferentes artículos del Código, implícita y directamente por ella afectados." Muñoz Morales, Anotaciones al Código Civil, Libro Primero, pág. 401.

Es evidente que al ampliar, a través de la Ley 229, el concepto sobre hijos naturales contenido en el artículo 125 del Código Civil, el legislador quiso hacer desaparecer, en cuanto a los nacidos de esa fecha en adelante, las diferencias entre las distintas categorías de hijos *ilegítimos* que existían en nuestra legislación: ilegítimos *naturales* e ilegítimos *no naturales* (adulterinos o incestuosos). Para dar, por lo tanto, sentido real y plenitud de expresión a ese propósito legislativo, debemos interpretar y aplicar la Ley 229 en forma que se equipare verdaderamente a unos y otros, no meramente en su nomenclatura jurídica, sino *en sus oportunidades reales* de filiación, pues es un hecho innegable que si bien la Ley 229 borra las diferencias legales de los hijos, no borra—no puede borrar—los impedimentos legales de los padres, ni el carácter delictivo de la cópula, ni la sanción social de los delitos; y por ello, si en las acciones filiatorias bajo dicha ley se somete a los hijos adulterinos e incestuosos a las normas de prueba que para la filiación de los naturales establece el artículo 125 del Código Civil, se estará haciendo gravitar sobre aquéllos, en sus oportunidades *reales* de filiación, la desigualdad surgente de la condición jurídica de sus padres y las diferencias derivadas de la relación delictiva bajo la cual fueron engendrados. Así no se produce la verdadera igualdad entre ilegítimos naturales e ilegítimos no naturales. Así se consagra el régimen de inferioridad de

éstos, en su impotencia real para equipararse a aquéllos. Así se perpetúa un acto de indignidad del padre y se inmola el derecho a la dignidad del hijo. Ése no es el alcance de la Ley 229. Ésas no pueden ni deben ser sus consecuencias.

Las leyes deben interpretarse y aplicarse en comunión con el propósito social que las inspira. No deben desvincularse del problema humano cuya solución persiguen, ni descarnarse de las realidades de vida que la sociedad misma ha proyectado sobre ellas, pues se tornaría ilusorio y se perdería en el vacío el deseo de justicia que las genera. Por eso, los requisitos de prueba del artículo 125 sobre *concubinato* y *posesión de estado*—que se consignaron en dicho precepto a los fines de la acción de reconocimiento de los hijos naturales de antes, y que responden a situaciones reales no proscritas de la vida social—no pueden ser cauces apropiados de utilidad real para la acción filiatoria de los hijos adulterinos e incestuosos, engendrados como consecuencia de relaciones proscritas socialmente.

La Ley 229, por la necesaria implicación de su propósito social, autoriza la investigación de la paternidad ilegítima no natural para los fines de la acción filiatoria en la misma forma que se investiga ahora esa misma paternidad para los fines de la acción de alimentos. Si no fuera así, tendríamos que concluir que la Ley 229 no equipara verdaderamente a los hijos adulterinos e incestuosos con los naturales de antes *en sus oportunidades* para lograr la filiación, pues éstas dependerían, en los casos de concubinato y posesión de estado, de la proclamación de actos delictivos, y ante la realidad de que ni del adulterio, ni del incesto, ni de la prole así obtenida, se hace ostentación pública por el hombre, según sus normas de conducta en el grupo social, someter el derecho filiatorio de esos hijos a la prueba del *concubinato* de sus padres, o la de *posesión de estado*, equivaldría a negarles de antemano toda oportunidad real de reconocimiento, y a anular el propósito de la Ley 229. Si a un hijo *adulterino* o *incestuoso* se le obligara a probar la *posesión continua de*

*estado* mediante actos voluntarios de reconocimiento del padre—según el alcance dado al inciso 2 del artículo 125 del Código Civil en su negación de la libre investigación de la paternidad, Sentencias del Tribunal Supremo de España de 6 de junio de 1931, 200 Jurisprudencia Civil 247; 26 de abril de 1916, 136 Jurisprudencia Civil 279; 12 de octubre de 1907, 108 Jurisprudencia Civil 558 y 26 de junio de 1903, 95 Jurisprudencia Civil 1021—o el *concubinato* de sus padres al tiempo de su concepción, se estaría sellando su suerte como hijo "del acaso y de lo desconocido", 1 Scaevola, Jurisprudencia del Código Civil 357, *Colón* v. *Sucn. A. J. Tristani*, 44 D.P.R. 171, porque ello significaría muy pocas, o ningunas, oportunidades para lograr su filiación. Difícil, si no imposible sería para un hijo *adulterino* o *incestuoso* nacido bajo la Ley 229 obtener su filiación, a menos que se considerara como factor determinante de ésta, bajo dicha ley, la *paternidad*, evidenciada en forma fidedigna por cualquier medio de prueba aceptado por la ley. El caso de autos lo comprueba. El concubinato, que se encontró probado por el juez sentenciador, no quedó establecido por la prueba. La posesión continua del estado de hijo natural, a mi juicio, no existe. Puede razonablemente vislumbrarse que bajo dicha ley jamás habrá una sentencia de filiación basada en concubinato, a favor de un hijo *adulterino* o *incestuoso*, porque estaría llamado éste, de acuerdo con el artículo 125 del Código Civil, a probar que sus padres se conducían en público como casados, cuando la realidad—fundada en los hábitos de vida y en las normas de conducta establecidas por el grupo social—es la de que nadie proclama ni hace ostentación pública de delito—en estos casos, adulterio o incesto. E igualmente puede vislumbrarse que nunca—o casi nunca—habrá una sentencia de filiación a favor de uno de dichos hijos, fundada en posesión de estado.

Los requisitos de prueba de *concubinato* y de *posesión de estado* en las acciones filiatorias entabladas por hijos adulterinos e incestuosos nacidos bajo la Ley 229, sitúan a éstos

—por el gravamen que imponen sobre sus oportunidades de filiación las relaciones delictivas de sus padres—en evidente desventaja con los *naturales* de antes de dicha ley. El nuevo concepto jurídico de "naturales" no responde a la realidad social bajo la cual los adulterinos e incestuosos fueron engendrados. Llamar a éstos "naturales" y aplicarles entonces el apretado molde del artículo 125 para que puedan tener derecho a un padre, ciertamente que no colma la aspiración legislativa. Si ése fuera el impacto de la Ley 229 en la legislación anterior, tendríamos que proclamar que lo que hizo el legislador al aprobar dicha ley no fué eliminar las diferencias entre los hijos ilegítimos *no naturales*, y los *naturales*, sino aminorar la crudeza de los conceptos de *adulterinos* e *incestuosos*, llamándoles "naturales", pero sin quitarles el rigor de sus desventajas reales ante los naturales. Si así fuera, los adulterinos e incestuosos nacidos bajo la vigencia de la Ley 229 seguirían siendo ahora tan inferiores como antes, a pesar de su nueva rúbrica de "naturales", porque dicha ley no destruyó su inferioridad jurídica frente a los naturales *en sus oportunidades reales de filiación*, sino que se limitó a darles un nuevo nombre, sin mejorar su categoría, pues para los fines de la acción filiatoria los dejó tan adulterinos y tan incestuosos, y tan desprovistos de justicia como hasta entonces.

■ Nuestra sentencia confirmatoria de hoy no logra a plenitud el propósito de justicia social que inspiró la legislación que nos ocupa. A pesar del resultado en este caso, más bien hemos derrotado ese propósito. La eliminación, por obsoleta y antijurídica, de la regla sobre "prueba robusta y convincente" de la posesión de estado, con lo cual estoy de acuerdo—regla que nunca debió haberse afincado en nuestra jurisprudencia—no se produce como resultado de la vigencia de la Ley 229, ni ofrece medio adecuado para la realización del amplio propósito social del estatuto. Aun eliminada esa regla, el inciso 2 del artículo 125 requiere que los adulterinos e incestuosos prueben la posesión *continua*

del estado de hijo natural. Si se aplica ese inciso debe cumplirse con sus requisitos. El de *continuidad*, a mi juicio, no está presente. En consecuencia, considero la prueba insuficiente para confirmar la sentencia por ese fundamento.

■■ Resulta un anacronismo jurídico que el poder judicial niegue consecuencias a, y anule en su propósito esencial de igualdad real—en su hondo sentido de dignidad humana—un precepto de ley substantiva, por la razón de que el poder legislativo no fijó expresamente un medio para que esa igualdad pudiera manifestarse. Pero el derecho a tener un padre no debe hacerse depender del grado de eficiencia con que se redacte un estatuto. Conocido su objetivo y la filosofía que lo inspira, debemos hacer efectivo su propósito fundamental. La igualdad no permite discrímenes ni autoriza privilegios. No puede haber igualdad real entre los hijos naturales y los adulterinos e incestuosos mientras se someta a éstos a los rigores de un reconocimiento basado en *posesión continua de estado* y en *concubinato*, porque en la vida real, bajo el orden social establecido, esos estados si se producen no se consolidan, y si se consolidan no se manifiestan abiertamente para que los adulterinos e incestuosos puedan beneficiarse de ellos, constituyendo la exigencia de su prueba, en efecto, una negación del derecho, reconocídoles por la Ley 229, a investigar su origen.

Nuestra generación tiene el deber de desarraigarse de tradiciones y precedentes que resultan arcaicos en nuestro tiempo porque no responden al estado actual de nuestra conciencia colectiva ni al progresivo desarrollo de nuestra filosofía judicial. El derecho a la filiación de los hijos adulterinos e incestuosos, bajo la Ley 229, debe predicarse en la investigación de la paternidad, a través de cualquier medio legítimo de prueba, que es la implicación natural de dicha ley; no en admisiones públicas de la paternidad, que es lo que exige el requisito de posesión de estado, ni en relaciones públicas de adulterio, que es lo que en cuanto a ellos exige el requisito de concubinato.

■■■ El *sentido de injusticia* que inquieta a veces la conciencia en su busca de la verdad, y que como fuente espontánea de la formación del derecho contribuye con su corriente a la integración activa del acervo jurídico, marca una diferencia fundamental en la actitud práctica de los tribunales al convertirse en criterio adecuado para llegar a un verdadero *sentido de justicia* en las controversias judiciales. Cahn, *The Sense of Injustice*, 11, 31.  No sería justo privar de su filiación a un hijo adulterino o incestuoso bajo la Ley 229 porque no pueda judicialmente probar el improbable hecho de que su padre *confesó* o *admitió* públicamente su paternidad o proclamó públicamente su delito.  Las leyes se hacen por los hombres y se interpretan para los hombres.  Por eso, en su interpretación, debe ser factor preeminente la realidad humana de la vida, no la abstracción dogmática de reglas eternas e inmutables; mucho menos las normas de discrimen social repudiadas ya por la ley fundamental del Estado, aunque ésta con efecto prospectivo.  Véanse, Max Radin, *Law as Logic and Experience*, pág. VIII, 46, 160 *et seq.;* Cardozo, *Growth of the Law*, págs. 87 et seq. y *The Paradoxes of Legal Science*, pág. 31 et seq.; Pound, *Contemporary Juristic Theory*, págs. 11, 17 et seq.; *Garlan, Legal Realism and Justice*, pág. 13 et seq.  En esta época de justicia social debemos marchar hacia la humanización de la justicia y el derecho, dejando atrás en su decadencia rigorista el sentido dogmático del derecho y la justicia.

El alcance de la Ley 229 debe fijarse, para dar viabilidad al propósito esencial del legislador, poniendo énfasis en el bienestar social según lo concibe *"el sentido social de la justicia inmanente en el pensamiento del hombre común"*, ya que "Quizá el avance más significativo en la ciencia moderna del derecho es el cambio de actitud, de la analítica a la funcional. . . . El énfasis ha cambiado del contenido del precepto y la existencia del remedio, al efecto del precepto en acción y la capacidad y eficiencia del remedio en el logro de los fines para los cuales el precepto fué conce-

bido", Cardozo, *The Nature of the Judicial Process*, pág. 71 et seq., y teniendo presente que "Lo que está en el espíritu de un estatuto está en el estatuto, aunque no esté en su letra; y lo que está en su letra no está en el estatuto, a menos que esté en su intención," *In re Lambrecht* (Mich.) 100 N.W. 606; *Common Council* v. *Rush* (Mich.) 46 N.W. 951; *cf.* artículo 19, Código Civil, ed. 1930. Al así hacerlo no estaríamos legislando, ni siquiera en la esfera permisible de la "legislación intersticial", Cardozo, ob cit., págs. 98, 113, *et seq.*

Es mi criterio que la Ley 229 ha modificado sustancialmente el artículo 125 del Código Civil, incorporando al mismo aquellos medios de prueba permitidos hasta entonces en la investigación de la paternidad ilegítima *no natural*. En otras palabras: amplió el ámbito de las consecuencias jurídicas de la investigación judicial de la paternidad, investigación que se permitía a los ilegítimos *no naturales*, bajo el artículo 129 del Código Civil(⁶) en relación con el 128 del propio cuerpo legal, antes de la Ley 229, en la acción civil dirigida a obtener alimentos, y que después de dicha ley y bajo ésta, debe permitirse a todos los ilegítimos—ahora "naturales"—en la acción dirigida a obtener su filiación. Ello es así porque aunque se les llame "naturales", los adulterinos e incestuosos siguen siendo tales, y la investigación judicial de la paternidad *natural* autorizada por el inciso 4 del artículo 125 del Código Civil, "Cuando el hijo pueda presentar cualquier prueba auténtica de su paternidad", no es ni puede ser medio adecuado para la investigación de la

---

(⁶) Los citados artículos disponen:

"Artículo 128.—Los hijos ilegítimos en quienes no concurra la condición legal de naturales, sólo tendrán derecho a exigir de sus padres alimentos, conforme al artículo 143."

"Artículo 129.—El derecho a los alimentos de que habla el artículo anterior, sólo podrá ejercitarse:

1. Si la paternidad o maternidad se infiere de una sentencia firme dictada en proceso criminal o civil.

2. Si la paternidad o maternidad resulta de un documento indubitado del padre o de la madre, en que expresamente reconozca la filiación."

paternidad ilegítima *no natural*, que es la que por implica-
ción necesaria autoriza la Ley 229. El legislador conocía el
estado de nuestra jurisprudencia interpretativa del artículo
129 del Código Civil(7) y al trasladar los hijos ilegítimos
*no naturales* al status legal de "naturales" evidentemente
trasladó con ellos los medios de prueba que para la investi-
gación de la paternidad ilegítima *no natural* autorizaba el
citado artículo 129. Por eso, cumplido ese requisito y pro-
bada satisfactoriamente la paternidad en este caso, voto
por la confirmación de la sentencia, independientemente de
la insuficiencia de la prueba sobre concubinato y posesión
de estado. El propósito social de la Ley 229 y el estado de
esa jurisprudencia—fuente de autoridad de la investigación
de la paternidad ilegítima *no natural*—hacen inevitable la
anterior conclusión. No dar esa interpretación a la Ley 229
es perpetuar la actual contradicción jurídica—monstruosi-
dad jurídica, más bien—de que establecida judicialmente la
paternidad, y desaparecido el impedimento para obtener su
filiación, el hijo no tiene derecho a un padre, a pesar de que
por padre se condena a éste a alimentarlo; el hijo tiene ali-
mentos, pero no apellido; hay paternidad declarada por el
poder judicial, pero no tiene consecuencias jurídicas esa
paternidad así declara, porque el Estado protege a ese
"ente sobrenatural y milagroso . . . que sólo puede ser
conocido cuando se digna descender del trono de la pasión
sexual para derramar por piedad o misericordia sobre la
cabeza de su hijo el preciado óleo de la filiación" 1 Scaevola,
Jurisprudencia del Código Civil 357. No dar esa significa-
ción a la Ley 229, e insistir en la inexorable aplicación del
artículo 125 del Código Civil—que se inspiró en la filosofía
social conservadora del artículo 135 del Código Civil Espa-

---

(7) *Rivera* v. *Cardona*, 56 D.P.R. 819; *Cerra* v. *Corte*, 67 D.P.R. 929;
véanse *Pueblo* v. *Rohena*, 52 D.P.R. 313; *Pueblo* v. *López*, 54 D.P.R. 294;
*Pueblo* v. *Rotger*, 55 D.P.R. 139; *Pueblo* v. *Pérez*, 55 D.P.R. 677; *Pueblo*
v. *Rodríguez*, 67 D.P.R. 735; *Pueblo* v. *Ramos*, 61 D.P.R. 333, 338; *Rodrí-
guez* v. *Cruz*, 68 D.P.R. 751; *Pueblo* v. *López*, 67 D.P.R. 785: *Sánchez*
v. *Corte*, 64 D.P.R. 478.

ñol, predicada a su vez en el *reconocimiento voluntario* y la prohibición de la investigación de la paternidad—es cerrar los ojos a la realidad social del derecho. Las siguientes palabras del Juez Frankfurter en su opinión disidente en el caso de *Pope* v. *Atlantic Coast Line Railroad Co.* 345 U.S. 379, 392, 97 L. ed. (*Advance* págs. 719, 726) parecen escritas para la ocasión: "Descartar las implicaciones naturales de un estatuto y aprisionar nuestra lectura de él en la concha de las meras palabras es cometer el pecado cardinal en interpretación estatutaria: ciega literalidad."

Los derechos de los hijos adulterinos e incestuosos nacidos en Puerto Rico en la década de 1942 a 1952 bajo la Ley 229—década que se adentra en la segunda mitad del Siglo XX con un claro y profundo sentido de los derechos del hombre—no deben someterse al rigor de una filosofía de privilegio de cuna que, en patente negación de los principios de igualdad humana, inspiró la legislación española en la segunda mitad del Siglo XIX. Para dar concreción de realidad a esos derechos, hay que medirlos por las normas de justicia social que inspiran la legislación puertorriqueña de la época presente. Ésa es parte de la imperativa función social de la justicia.

---

Opinión del JUEZ ASOCIADO SEÑOR ORTIZ en la cual concurre el JUEZ PRESIDENTE SEÑOR SNYDER.

En esta acción de filiación tramitada originalmente ante la Sección de Bayamón del anterior Tribunal de Distrito de Puerto Rico, se dictó sentencia por el tribunal a quo declarando con lugar la demanda. Se alega en la demanda que siendo soltera María Figueroa Fuentes sostuvo relaciones de concubinato bajo un mismo techo con el demandado desde el mes de febrero de 1948, estando éste casado con otra mujer, y que de esas relaciones procrearon a la menor Migdalia Figueroa, quien nació el 19 de diciembre de 1948. Se expone, además, en la demanda que siempre se ha encontrado y se encuentra en la posesión continua de hija natural del deman-

dado y que "desde que la demandante se encontraba en estado grávido hasta que naciera la referida menor y posteriormente siempre ha tratado a dicha menor como su hija, tratándola como tal en público y en privado, habiendo provisto a la demandante antes del alumbramiento de dicha hija menor, con medios para su cuidado y atención y para su alumbramiento". El demandado negó los hechos alegados en la demanda. Al dictar sentencia declarando con lugar la demanda, el tribunal a quo formuló las siguientes conclusiones sobre los hechos:

"1. Telesforo Díaz es un hombre casado desde 1934, pero este hecho no le impide ni le ha impedido cometer actos de adulterio, a virtud de los cuales ha procreado hijos fuera del matrimonio.

"2. María Figueroa Fuentes es una joven divorciada, pero de buena reputación en lo que a castidad se refiere, que vive y ha vivido desde hace algunos años en compañía de su señora madre en el Municipio de Naranjito.

"3. El demandante (sic) requirió de amores a María durante el mes de febrero de 1948, ella le correspondió, y mantuvieron relaciones de concubinato durante seis meses, a sabiendas del vecindario, en el domicilio de la madre de María.

"4. Como resultado de estas relaciones, nació una niña en 19 de diciembre de 1948, quien fué inscrita en el Registro Demográfico como hija natural de María Figueroa con el nombre de Migdalia Figueroa.

"5. Mientras María Figueroa se encontraba encinta, y posteriormente (sic) al parto, el demandado había realizado actos de reconocimiento, públicamente, y tendentes a demostrar que él es el padre de la niña, tales como visitar a María, instigarla a sacarse la criatura mediante aborto criminal para lo cual le dió $25; mandarle $10 al hospital con su hermano; insistir en cumplir sus deberes de padre con la condición de que la demandante se desprendiera de su hija y la entregara a su esposa; y por fin prodigándole caricias y mimos cuando la vió por vez primera en su casa.

"6. El demandado se ha negado a reconocer a esta niña como hija suya, por lo que también se ha negado a proporcionarle su apellido y alimentos.

"7. El Juez que suscribe pudo observar cierto parecido físico entre el demandado y la niña."

El tribunal sentenciador formuló las siguientes conclusiones de derecho:

"1. El Tribunal tiene jurisdicción sobre las partes y sobre la materia.

"2. Los hechos alegados en la demanda son suficientes para constituir una causa de acción.

"3. El demandado, Telesforo Díaz, sostuvo relaciones de concubinato con María Figueroa Fuentes, en el domicilio de la madre de ésta, constituyendo este domicilio el techo bajo el cual dichas relaciones se efectuaron privada y públicamente.

"4. Telesforo Díaz es el padre natural de la niña Migdalia Figueroa.

"5. Migdalia Figueroa tiene derecho a llevar el apellido de su padre, y por tanto debe ser inscrita y reconocida públicamente como Migdalia Díaz Figueroa.

"6. Migdalia Díaz Figueroa tiene derecho a recibir alimentos de su padre, Telesforo Díaz, y éste está en la obligación de darlos."

El demandado ha apelado para ante este Tribunal y ha señalado los siguientes errores:

"PRIMER ERROR: El Tribunal de Distrito cometió error al concluir que 'Telesforo Díaz sostuvo relaciones de concubinato con María Figueroa Fuentes en el domicilio de la madre de ésta constituyendo este domicilio el techo bajo el cual dichas relaciones se efectuaron privada y públicamente' (párrafo 3 de las Conclusiones de Derecho al folio 10—Trans. de Evid.).

"SEGUNDO ERROR: El Tribunal de Distrito cometió error claro en la apreciación de la prueba y al aquilatar la misma procedió con prejuicio y parcialidad siendo equivocada su conclusión de que de la prueba quedó establecido el concubinato público y privado entre la demandante y el demandado, única base en que funda su sentencia, y por consiguiente procede la revocación de la misma."

Se trata en este caso de un alegado hijo ilegítimo, conocido anteriormente como hijo adulterino, de padres que al tiempo de la concepción del menor no podían casarse entre

sí. En vista de que la menor nació en el mes de diciembre de 1948, la acción entablada debe regirse por la Ley 229 de 12 de mayo de 1942, según la misma fué enmendada por la núm. 243 de 12 de mayo de 1945. Esa ley dispone en su sección primera que: "Serán hijos naturales todos los hijos nacidos fuera de matrimonio con posterioridad a la fecha de vigencia de esta Ley, independientemente de que sus padres hubieren podido o no contraer matrimonio al tiempo de la concepción de dichos hijos. . . ."

La sección 2 dispone lo siguiente:

"Los hijos nacidos fuera de matrimonio con anterioridad a la fecha de vigencia de esta Ley y que no tenían la condición de hijos naturales según la legislación anterior, podrán ser reconocidos por acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, a todos los efectos legales. Estos hijos quedarán legitimados por el subsiguiente matrimonio de sus padres entre sí.

"En caso de que los hijos a que se refiere esta sección no fueren reconocidos por la acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia, dichos hijos se considerarán hijos naturales al solo efecto de llevar el apellido de sus padres. La acción para este reconocimiento se tramitará de acuerdo con el procedimiento que fija el Código Civil de Puerto Rico para el reconocimiento de hijos naturales; *Entendiéndose, sin embargo,* que tal reconocimiento sólo tendrá el alcance que aquí se expresa."

El primer problema que surge ante nuestra consideración consiste en determinar si un hijo nacido fuera de matrimonio con posterioridad a las fechas de aprobación de las leyes 229 de 1942 y 243 de 1945, tiene que demostrar, en una acción de filiación, que en cuanto a él se ha cumplido con los preceptos y requisitos del artículo 125 del Código Civil, o sea, que sus padres vivían en estado de concubinato al tiempo de la concepción o nacimiento del hijo, o que el hijo se ha hallado en la posesión continua del estado de hijo natural o cuando exista algún escrito indubitado del padre en que expresamente reconozca la paternidad o cuando exista

alguna prueba auténtica de la paternidad. Con respecto a hijos nacidos fuera de matrimonio con anterioridad a la vigencia de la Ley 243 de 1945, dicha ley específicamente dispone que la acción para el reconocimiento se tramitará de acuerdo con el procedimiento que fija el Código Civil de Puerto Rico, cuando los hijos no fueren reconocidos por la acción voluntaria de sus padres. Ello conlleva la aplicación a tales casos de los preceptos del ya citado artículo 125 del Código Civil. *Vargas v. Jusino,* 71 D.P.R. 389, 392, 393. El artículo 125 se refiere a actuaciones de los padres que determinan un reconocimiento, pero esas actuaciones, como cuestión de procedimiento, deben probarse en la acción judicial correspondiente. Ahora bien, en cuanto a hijos nacidos fuera de matrimonio con posterioridad a la fecha de la vigencia de la Ley 229 de 1942, como la menor envuelta en este litigio, todos ellos son declarados hijos naturales, independientemente de que sus padres hubieren podido o no contraer matrimonio al tiempo de la concepción de dichos hijos, por la sección 1 de dicha ley. Tal sección no dispone expresamente que el reconocimiento de tales hijos se tramitará de acuerdo con el Código Civil. Sin embargo, entendemos que fué el propósito esencial del legislador al aprobar la sección 1 de la citada ley 229 de 1942 el de eliminar cualquier posible diferencia entre hijos naturales y adulterinos nacidos con posterioridad a la vigencia de la ley. No fué el propósito el de eliminar los requisitos de prueba contenidos en el artículo 125. De haber sido tal la intención legislativa, la Asamblea Legislativa hubiese derogado o enmendado expresamente dicho artículo. No hubo derogación implícita, ya que la creación de la igualdad entre hijos nacidos fuera de matrimonio no es incompatible con la necesidad de demostrar el *status* de tales hijos mediante cierta clase de prueba.

Ahora bien, siendo aplicables al caso de autos las disposiciones del artículo 125 del Código Civil, erró el tribunal inferior al concluir que se había probado que María Figueroa Fuentes y Telesforo Díaz habían vivido juntos en

concubinato. La prueba de la parte demandante en cuanto a tal extremo, creída por el tribunal sentenciador, fué al efecto de que el demandado enamoraba a María Figueroa Fuentes, madre de la menor, y allá para los meses de febrero y marzo de 1948 sostuvieron relaciones carnales; que aquélla vivía en casa de su señora madre en el "Cerro Número 2" de Naranjito; que el demandado, quien era hombre casado y vivía en Corozal, visitaba a María dos veces por semana, entrando a la casa de ella temprano en la noche y yéndose por la madrugada o por la mañana; que cuando la madre de la menor tenía cuatro meses de embarazo él le dió $25 para que se extrajera la criatura pero que tal cosa no fué posible; que después de María quedar encinta sólo la visitó tres veces, y que la menor nació el 19 de diciembre de 1948. Aunque el hecho de que el supuesto padre tenga otra residencia que el de la madre no es incompatible con la existencia de un estado de concubinato entre ellos y aunque no es necesario que el hombre y su querida se hagan pasar ante el público como marido y mujer para que se establezca un concubinato, ni tampoco que las relaciones sean notorias (*Estela* v. *Sucn. Medraño*, 51 D.P.R. 548), sin embargo, las meras visitas esporádicas con el objeto de tener relaciones sexuales que no equivalgan a un estado de vida marital, que sea real, sin necesidad de matrimonio, no son suficientes para constituir un estado de concubinato. (*Estela* v. *Sucn. Medraño*, supra, a la página 554.) El concepto de concubinato en su esencia comprende la relación entre un hombre y una mujer que hacen vida de esposos sin serlo. *Vázquez* v. *De Jesús*, 65 D.P.R. 900, 903. En este caso la prueba no demuestra que María Figueroa Fuentes y el demandado hicieran vida de esposos. Sin embargo, la apelación se da contra la sentencia y no contra los fundamentos de la opinión, y la sentencia dictada en este caso puede y debe ser sostenida por otros motivos. *Cf. Bianchi* v. *Sucn. Bianchi*, 67 D.P.R. 594, 601; *Cruz* v. *Carrasquillo*, 61 D.P.R. 435. Entendemos y resolvemos que, en vista de las circunstancias especiales de

este caso, se probó la posesión continua de estado. Es cierto que este Tribunal ha resuelto que la prueba de la posesión continua de estado ha de ser robusta y convincente. *Santiago* v. *Martínez*, 72 D.P.R. 934, 941; *Vargas* v. *Jusino*, supra; *Vázquez* v. *Sucn. Boyrié*, 52 D.P.R. 856, 859; *Torres* v. *Sucn. Caballero*, 39 D.P.R. 724, 730; *Fontánez* v. *Sucn. Buxó*, 36 D.P.R. 227, 232; *Vega* v. *Sucn. Vega*, 32 D.P.R. 595, 598; *Medina* v. *Sucn. Bird*, 30 D.P.R. 158, 162; *Marrero* v. *Fordham*, 27 D.P.R. 708, 712; *Méndez* v. *Martínez*, 21 D.P.R. 252, 267; *Negueruela* v. *Somohano*, 16 D.P.R. 692, 694. No debemos aplicar a este caso una norma de interpretación tan rígida y restrictiva. En primer término, el estatuto tan sólo requiere una demostración de "posesión continua de estado". Nada hay en la ley que exija determinado "quantum" o calidad de prueba para justificar el cumplimiento de tal requisito. El concepto de "prueba robusta y convincente" se ha adherido a la ley por interpretación judicial y no debe transformarse en un imperativo categórico que sea mecánico e inflexible y que sea un obstáculo a la verdad y a la justicia en un caso determinado. Escapemos de la tiranía de las palabras y de la prisión de los conceptos puramente mecánicos para que podamos disfrutar responsablemente de la libertad judicial de atender a los méritos de cada caso, desde el punto de vista de las realidades de la vida y de determinados intereses sociales e individuales. Ello no implica, naturalmente, que ignoremos la letra de la ley y que el capricho, o aun la filosofía, del juzgador se utilice para sustituir o sacrificar el precepto del estatuto. Estamos en un gobierno de leyes y no de hombres. Pero la conveniencia de evitar una justicia individualizada más allá del ámbito de la ley es compatible con el *desideratum* de interpretar las palabras del estatuto en forma dinámica, flexible y realista.

En cuanto al problema que nos ocupa, comprendemos, en cuanto a la clase de prueba requerida para establecer la filiación, que el juzgador se enfrenta con el dilema de

hacer justicia a hijos inocentes, especialmente desde el punto de vista del reconocimiento cabal de la igualdad esencial que debe existir entre los seres humanos, y al mismo tiempo reconocer que el *status* de hijo y de miembro de una familia tiene una pronunciada significación social y que, por lo tanto, no deben quedar abiertas las puertas para reclamaciones ficticias o fraudulentas de filiación. La eliminación de categorías rígidas no debe implicar que el juzgador deba dejar de cumplir con su alta responsabilidad social de aquilatar cuidadosamente la prueba en casos de filiación, y de resolver de acuerdo con una auténtica preponderancia de la evidencia. De otro lado, la invocación de la trascendencia social de la relación de padre e hijo sirve muchas veces como "premisa inarticulada" de una actitud contraria a la igualdad entre todos los hijos, ya sean legítimos o naturales. Es por ello que nosotros, como juzgadores, debemos imprimirle vitalidad a la letra de la ley, no precisamente desde el punto de vista de nuestra filosofía individual, sino desde el punto de vista de la filosofía imperante en la comunidad, tal como ella se traduce a través del desarrollo de las leyes. A menos que la letra de la ley exija determinada interpretación, tanto la historia legislativa y social de la ley en cuestión como los estatutos posteriores *in pari materia* pueden ser utilizados en ayuda de la interpretación que corresponda, a los fines de lograr una adecuada armonía en cuanto a satisfacción del propósito legislativo. 50 Am. Jur. 274 et seq., 328, 329, 343 et seq. De acuerdo con los artículos 18 y 19 de nuestro Código Civil, las leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro y, además, el medio más eficaz y universal para descubrir el verdadero sentido de una ley cuando sus expresiones son dudosas, es considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla. Es importante, por lo tanto, el que consideremos

la historia de los conceptos relativos a la filiación de hijos ilegítimos y a la forma de probar tal *status*, esto es, en lo sustantivo y en lo adjetivo.

Bajo el antiguo sistema legal romano se le daba extraordinaria importancia a la institución de la familia, que formaba un *imperium in imperio* más antiguo que el Estado. Hunter, Derecho Romano, pág. 34. Prevalecía la doctrina patriarcal de la familia, basada en la autoridad del padre. Sherman, *Roman Law in the Modern World*, Vol. 2, pág. 44. Tal concepto implicaba una actitud rigorosa en cuanto a los derechos de hijos ilegítimos. 30 Col. L. Rev. 308, 310: "The Familiar Property Rights of Illegitimate Children: A Comparative Study". De otro lado, era relativamente fácil el probar el *status* de hijo ilegítimo, siendo ello una sencilla cuestión de hecho, sin mayores limitaciones que en cuanto a cualquier otra cuestión de hecho en cualquier otra relación jurídica. 30 Col. L. Rev. 322.

Bajo el antiguo derecho francés, anterior al Código Napoleónico, no se imponía restricción alguna a la investigación de la paternidad y aun bastaba con la declaración de la presunta madre para establecer la maternidad, bajo la máxima de *créditur virgini parturienti asserenti se pragnantem esse es aliquo* (había que creer en la anterior virgen porque los gastos de parto no sufren retraso). Véase Colin y Capitant, Derecho Civil, Vol. 1, pág. 621 [2da. ed. pág. 600]. Pero fueron tales los abusos de libertad tan absoluta que, luego, durante más de un siglo, prevaleció en Francia el artículo 340 del Código Napoleónico, que prohibió la investigación de la paternidad y dispuso que, excepto en casos de rapto, la filiación de un hijo natural sólo podía resultar del reconocimiento voluntario por el padre. Colin y Capitant, ob. cit., pág. 621. La innovación fué más allá de lo justo (1 Manresa 631, 6ta. ed.) y se basó en el deseo de evitar escándalos, decisiones arbitrarias y chantajes, en casos en que es difícil y a veces imposible el probar con absoluta certeza la paternidad, debido "al velo impenetrable del misterio que rodea a la paternidad",

según dijo el autor del artículo 340. 1 Manresa, ob. cit., 630. En cuanto a tales fundamentos, en Colin y Capitant, ob. cit., 623 [2da. ed. pág. 602], se dice lo siguiente:

"La refutación del primero de estos argumentos es fácil. La ley tolera procesos tanto civiles como criminales de divorcio, de negación de paternidad, adulterio, proxenetismo, delitos contra la honestidad y buenas costumbres, tan desagradables y tan perturbadores de la tranquilidad de las familias como puede serlo un pleito de la investigación de la paternidad. ¿No se produce el más grave escándalo en una legislación que permite el abandono de madres y de hijos con la desmoralización que semejantes perspectivas producen en las relaciones entre los sexos, sobre todo en el seno de las grandes aglomeraciones obreras?

"En cuanto a la segunda razón, hay que reconocer que es notoriamente exagerada. Prueba de que no es absolutamente imposible la demostración de la paternidad natural, es que la ley la permite en un caso, en el de rapto. Y además, no es difícil concebir hipótesis en las que la paternidad descansa en verosimilitudes, en presunciones de tanta importancia como las que resultan, ya del rapto, ya del reconocimiento voluntario por acta auténtica. Así sucede especialmente en caso de violación, de manifestaciones de paternidad hechas por escrito reiterada y formalmente, de posesión de estado. La cohabitación constante de dos concubinos que viven como si estuvieran casados, ¿no entraña la misma prevención de relaciones sexuales que las que deriva del matrimonio? Y la presunción de fidelidad que debe corroborar la precedente para completar la prueba de la paternidad, prevención que, respecto de una mujer casada, resulta del hecho mismo del matrimonio, ¿no puede considerarse como suplida cuando la conducta de la madre soltera fuera de sus relaciones con su concubino no da lugar a censuras de ningún género?

"Tan débilmente justificada en razón, inhumana e inicua en sus resultados, la nueva regla de prohibición de investigación de la paternidad no debía subsistir.

"Fuera de Francia no goza la popularidad que durante largo tiempo fué unida al Código de Napoleón. Los países germánicos y anglosajones permanecieron fieles a la doctrina contraria. Suiza, cuyos cantones se dividieron en esta cuestión, se mostró en su Código civil unitario (artículo 307) partidaria del

principio de la libertad de la investigación. Una región, la de los países renanos, que al principio practicó el sistema francés, tuvo que admitir la investigación de la paternidad después de ponerse en vigor el Código civil alemán (artículos 1.716 y 1.717) ; esta modificación legislativa produjo muy buenos resultados. De la misma manera Bélgica ha admitido la investigación de la paternidad natural por su ley del 23 de abril de 1908.

"En Francia, bajo la influencia de la literatura novelesca y dramática, naturalmente compasiva con el hijo natural, se inició muy pronto un movimiento de protesta contra la regla del artículo 340. En este movimiento se ha visto marchar juntos a publicistas procedentes de los más opuestos campos: Víctor Hugo y Le Play, y a jurisconsultos de tendencia diametralmente contrarias: Acollas al lado de Jacquier y Lacoierta. Finalmente, después de varias tentativas inútiles de reforma legislativa, el Parlamento, admitiendo una proposición de los señores Gustave Rivet y Beranger, que se remontaban a 1905 y que había sufrido después numerosas modificaciones, concluyó por votar la ley del 16 de noviembre de 1911 (sic), la cual, introducida en el artículo 340, suprime el principio de la prohibición absoluta de la investigación de la paternidad fuera del matrimonio y lo reemplaza por la regla de la investigación en justicia, permitida y organizada en un cierto número de hipótesis taxativamente limitadas."

El artículo 340 del Código de Napoleón, sustituído ahora por la ley de 16 de noviembre de 1912, prohibía la pesquisa de la paternidad, como método de prueba. Independientemente de sus méritos, el artículo 340 fué adoptado por varios países, tales como Bélgica, Grecia, Holanda, Rumania, Haití, Costa Rica, Bolivia, Uruguay y Venezuela. 1 Manresa, ob. cit., 631. De otro lado, la libre investigación de paternidad mediante cualquier clase de prueba ha sido aceptada en Inglaterra, Escocia, muchos de los Estados en los Estados Unidos de América, Suecia, Noruega, Dinamarca, Austria, Hungría, Alemania, Suiza, Brasil, Méjico, Perú, Chile, República Argentina, Guatemala, Salvador y Honduras. Manresa, ob. cit., 631.

En España, antes de empezar a regir el Código Civil, los derechos y acciones de hijos ilegítimos se determinaban por la ley 11 de Toro. Bajo esa ley, los requisitos exigidos para que un hijo pudiese establecer su filiación eran los siguientes:

(1) Haber nacido de padres que al tiempo de la concepción o del nacimiento podían casarse válidamente sin dispensa, y

(2) Que fué reconocido por el padre, expresa o tácitamente. (*Planellas* v. *Sucn. Planellas*, 59 D.P.R. 372, 386; *Castro* v. *Solís*, 19 D.P.R. 677; *Ramírez et al* v. *Ramírez et al*, 30 D.P.R. 617.)

La ley 11 de Toro concedía una gran amplitud en cuanto a la prueba de la filiación, ya que permitía que se acreditase el reconocimiento tácito por cualquiera de los métodos de prueba establecidos en derecho. 1 Manresa 621, 6ta. ed. Sin embargo, al aprobarse el Código Civil, empezó a regir su artículo 135, análogo al 125 nuestro. Bajo el artículo 135, el padre está obligado a reconocer al hijo natural cuando exista un escrito indubitado del padre en que expresamente reconozca su paternidad o cuando el hijo se halle en la posesión continua de estado, justificada por actos directos del mismo padre o de su familia. Nuestro artículo 125 va más lejos y admite, para el establecimiento de la filiación, prueba del concubinato de ambas partes, y prueba auténtica de la paternidad. Tanto el Código Civil de España como el nuestro adoptan un término medio en cuanto a la pesquisa de la paternidad, ya que no la prohiben absolutamente, como ocurría en Francia, ni la permiten libremente en todos los casos, sino que permiten prueba de la filiación y de la paternidad en los casos taxativamente señalados en el Código, que ya hemos enumerado. 1 Manresa, ob. cit., pág. 630 et seq. Pero al así hacerlo, no se dijo nada en esos Códigos en cuanto a la clase de prueba que era necesaria para demostrar la existencia de uno de los casos, o de una de las situaciones, enumeradas en el Código. El requisito de "prueba robusta

y convincente" ha sido impuesto judicialmente, y no por el Código. Equivale a la creación judicial, y no estatutaria, de una regla de evidencia en cuanto a la clase de prueba requerida en virtud de determinada filosofía o política judicial. Es ésa la política que estamos ahora examinando. Veamos cuál es la política legislativa y constitucional que prevalece en Puerto Rico en cuanto a los derechos sustantivos de los hijos ilegítimos.

Ya hemos visto que las leyes 229 de 1942 y 243 de 1945 establecen la igualdad entre hijos "adulterinos" e hijos naturales nacidos con posterioridad a esas leyes. Bajo la ley 448 de 1947, el caudal hereditario de un causante debe dividirse por partes iguales entre todos sus hijos legítimos y naturales. *Cortés* v. *Cortés*, 73 D.P.R. 693. La sección 1 del artículo 2 de la Constitución del Estado Libre Asociado de Puerto Rico dispone que todos los hombres son iguales ante la ley, que no podrá establecerse discrimen alguno por motivo de nacimiento, origen o condición social y que las leyes encarnarán estos principios de esencial igualdad humana. El Informe de la Comisión de Carta de Derechos de la Convención Constituyente que aprobó nuestra Constitución dice, en parte, lo siguiente:

"El propósito de esta sección es fijar claramente como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional. La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño. En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposición constitucional, a la vez que obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto.

"    .    .    .    .    .    .    .    .

. "*Nacimiento*. Se propone eliminar el estigma jurídico en contra de los hijos habidos fuera de matrimonio. Se coloca a

todos los hijos respecto de sus padres y respecto del orden jurídico en igualdad de derechos. Las uniones ilícitas pueden y deben estar prohibidas y esta disposición tendrá como una de sus consecuencias el desalentarlas. Pero el fruto inocente de ellas, debe advenir al mundo libre de descalificaciones o de inferioridades jurídicas. Así lo exige el principio de la responsabilidad individual, con arreglo a la cual nadie es culpable por los actos que él mismo no realiza. Aunque la legislación actual ya cubre en casi su totalidad lo aquí dispuesto, será menester nueva legislación. A los fines de herencias y propiedades las modificaciones resultantes de esta sección no deberán ser retroactivas a nacimientos ocurridos antes de su vigencia.

"*Origen social.* Esta expresión reafirma el principio de descartar toda gradación, favoritismo o prejuicio al sopesar los ᵐéritos de una causa judicial, de una solicitud en el servicio público, de una subasta, etc., por motivos de origen o condición social."

Finalmente, la ley núm. 17, aprobada en 20 de agosto de 1952, intitulada: "Para establecer la igualdad de derechos de los hijos", dispone que todos los hijos tienen respecto a sus padres y a los bienes relictos por éstos los mismos derechos que corresponden a los hijos legítimos, siendo tal disposición retroactiva al día 25 de julio de 1952.

Todas esas disposiciones sirven de elocuente y definitiva expresión de una acentuada política y filosofía legislativa y constitucional de lograr la igualdad entre todos los hijos. Al interpretar el artículo 125 de nuestro Código Civil no debemos ignorar esos pronunciamientos, cuya *tónica* debe ser considerada en la formulación de un criterio general hermenéutico. Cf. Sentencia del Tribunal Supremo de España de 25 de mayo de 1945. Tal como indica la Comisión de Carta de Derechos en su informe, debemos descartar toda gradación, favoritismo o prejuicio al sopesar los méritos de causas judiciales que participen de la naturaleza de la actual. Al expresar nuestra inconformidad con el criterio de que en casos de filiación como el presente la prueba debe ser "robusta y convincente" no estamos legislando, sino que estamos eliminando un aditamento puramente judicial que este Tri-

bunal había incorporado al estatuto. Rechazamos la interpretación restrictiva del artículo 125 del Código Civil y adoptamos una interpretación declarativa, que se limita a declarar lo que dice el estatuto, o sea, que debe probarse la posesión continua de estado, sin normas previas judiciales en cuanto a la clase de prueba requerida. En síntesis, estamos en desacuerdo con la aplicación automática a todos los casos de una regla restrictiva en cuanto al *quantum* de prueba requerido. Preferimos que en cada caso específico haya margen para la demostración de la verdad en cuanto a la filiación de un hijo, debiendo el juzgador asumir cabalmente su delicada responsabilidad de aquilatar la prueba y resolver de acuerdo con la preponderancia de la evidencia, sin que su criterio esté subordinado a una regla mecánica y artificial.

■■ Examinemos la prueba presentada en este caso. De acuerdo con la prueba presentada por la parte demandante y creída por el tribunal a quo, en cuanto a la posesión de estado en sí, cuando la madre estaba en el hospital, el demandado le envió $10. En otra ocasión, el demandado le pidió a la madre, por conducto de una tercera persona, que le enviara a la niña para él reconocerla conjuntamente con su esposa. La demandante envió a la niña tres veces a casa del demandado y en una de esas tres ocasiones el demandado cogió a la niña en los brazos y la tuvo como dos horas. La esposa del demandado también decía que le dieran la niña a ella y al demandado para ellos reconocerla.

Considerada aisladamente, se podría alegar que esa prueba no era vigorosa ni robusta, bajo la regla que ha venido prevaleciendo en esta jurisdicción, y que ahora descartamos. Considerando el problema como uno de preponderancia de la prueba que sea creída por el tribunal inferior, en forma que no sea claramente errónea, y como uno de búsqueda y demostración de la verdad, esa prueba debe ser considerada desde el punto de vista de las circunstancias totales de este caso. En primer término, el concepto de

"posesión continua de estado", en lo que se refiere al adjetivo "continuo", ha sido correctamente definido en *Colón* v. *Sucn. A. J. Tristani*, 44 D.P.R. 171, 181, en la forma siguiente:

".... El adjetivo *continuo*, dice Scaevola, tiene varias acepciones, y en el caso del artículo 135 no puede tomarse en el de 'sin interrupción', sino en el de 'cosa que sigue a otra', determinándose así con el otro calificativo de 'constante', expresivo de perseverancia o repetición de actos. En nuestro concepto la palabra *continuo* debe interpretarse en el sentido de referirse a una serie de actos, a un conjunto de hechos ejecutados por la persona de quien se reclama el reconocimiento, y que sean bastantes, al examinarlos en globo, para constituir la posesión del estado de hijo natural. Una vez que esta serie de actos se ha realizado por un período razonable de tiempo, el padre no debe estar autorizado para revocar por sus actuaciones posteriores el reconocimiento que antes hizo. Establecer un principio contrario equivaldría a autorizar al padre para dejar sin efecto hechos que hubieran podido bastar al hijo para obtener su reconocimiento, si la acción se hubiese ejercitado con anterioridad a la fecha en que quedaron interrumpidas las relaciones que antes mediaron entre ambos."

En otras palabras, la *continuidad* se refiere a una serie de hechos que, aunque interrumpidos, estén relacionados entre sí y se manifiesten a través de un período razonable de tiempo. No existe una fórmula fija en cuanto a un número específico de hechos que puedan ser requeridos ni en cuanto a la duración del período de tiempo. En el caso de autos, la niña nació el 19 de diciembre de 1948 y la demanda se radicó el 19 de septiembre de 1949, o sea, nueve meses después. Fué corto el período de tiempo en que se pudieron realizar los hechos que daban lugar a la posesión de estado. Pero la niña reclamante no debe ser penalizada por haber radicado su demanda con prontitud, y debemos considerar que si fueron relativamente pocos los actos del demandado y su familia, ello posiblemente se debió a la fecha en que fué radicada la demanda. El caso podría ser distinto si

transcurriesen varios años entre el nacimiento y la radicación de la demanda de filiación ya que, en ese caso, de realizarse originalmente algunos actos aislados por el padre, el silencio o la pasividad de este último durante un largo período de tiempo podrían implicar un repudio implícito de los actos originales.

Otra circunstancia particular de este caso se refiere al hecho de que el padre compareció en el litigio y declaró como testigo, negando sustancialmente que él hubiese realizado los actos que se le imputaban. Él tuvo una oportunidad razonable de tratar de demostrar que la reclamación era falsa, pero el tribunal sentenciador no le dió crédito a su testimonio ni al de sus testigos. Criterio esencial en esta clase de casos es el de evitar reclamaciones fraudulentas en cuanto al *status* de un hijo como miembro de una familia. Pero si el propio padre tiene la oportunidad de comparecer, declarar y presentar prueba, quedan reducidas las probabilidades de alegaciones falsas de filiación. El hecho de que el testimonio y la prueba de un demandado no le hayan merecido crédito al tribunal, no desvirtúa la realidad de que existió la aptitud y oportunidad de rechazar la demanda y, por el contrario, tal hecho le da más fuerza y vigor a la reclamación de la demandante. El caso podría ser distinto si los labios del padre hubiesen sido sellados por la muerte, no existiendo entonces condiciones completamente adecuadas para rechazar una demanda de filiación.

Otro factor que singulariza este caso es el hecho de que se trata de una hija conocida anteriormente por *adulterina*. En esos casos, un padre casado, bajo determinado clima social, no está inclinado a hacer ostentación de su parentesco con respecto a tal clase de hijos. Esa renuncia constituye un factor relevante en cuanto a la posesión continua de estado, según lo ha aceptado la jurisprudencia, al señalar la diferencia en el trato de un hijo legítimo y uno natural. Sentencias del Tribunal Supremo de España de 26 de junio de 1903 y de 15 de junio de 1936.

Aunque técnicamente no se demostró que la madre y el demandado viviesen en concubinato, el tribunal a quo dió por probado que ellos tuvieron relaciones sexuales, hasta el punto de que el demandado visitaba a la madre dos veces en semana, quedándose con ella hasta por la madrugada y la mañana, y hubo prueba creída por la corte al efecto de que cuando ella estaba embarazada el demandado le dió $25 para que se extrajera la niña. Desde el punto de vista de la investigación judicial en cuanto a cuál es la verdad, tales hechos tienden a demostrar la realidad de la paternidad.

Todos esos factores tienden a demostrar que el concepto de posesión continua de estado no tiene un contenido fijo e invariable, sino que debe ser interpretado en forma dinámica, de acuerdo con las realidades envueltas en cada caso. Aplicando tales normas, tenemos que llegar a la conclusión de que el tribunal a quo actuó correctamente al declarar con lugar la demanda.

No debemos terminar esta opinión sin hacer referencia a una noble expresión contenida en una opinión disidente del Juez Del Toro, en *Ortiz* v. *Dragoni*, 59 D.P.R. 14, 29, en donde dice:

"No deben existir hijos sin padre. No debe eludirse la responsabilidad que liga al que engendra un ser humano con el fruto de su acto. Una vez que se demuestre la paternidad y que esa paternidad ha sido reconocida de alguna manera por el padre, no debe permitirse que el egoísmo, que las relaciones de familia, que las graves consecuencias materiales y morales que ello generalmente trae consigo, anulen el primer impulso espontáneo a virtud del cual se dejó oír la voz de la naturaleza misma, porque esa primera actuación es la que entraña la verdad y la justicia."

No obstante las diferencias de criterio que surgen de la exposición de esta opinión y de la opinión del Juez Asociado Sr. Negrón Fernández, una mayoría de este Tribunal—compuesta del Juez Presidente Sr. Snyder y de los Jueces Asociados Señores Negrón Fernández, Belaval y el infrascrito—

está conteste en que la regla sobre prueba robusta y convincente en casos de filiación es obsoleta, y debe ser descartada y se descarta de nuestra jurisprudencia.

*Debe confirmarse la sentencia apelada.*

---

Opinión disidente del JUEZ ASOCIADO SEÑOR MARRERO en la cual concurre el JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL.

Tengo necesariamente que convenir en que la prueba no demostró la existencia de un estado de concubinato entre la madre de la menor y el demandado. Así lo admite la propia demandante en su alegato, expresándose a la página 8 del mismo en la siguiente forma:

### "PRUEBA DE CONCUBINATO

"A la luz de la prueba antes reseñada nos encontramos con la única prueba que tiende a establecer el concubinato. Es la declaración de algunos testigos de la parte demandante al efecto de que Telesforo Díaz Marrero y María Figueroa tenían relaciones de marido y mujer (declaración de Rosa Nieves Rosado, pág. 17 T. de E.) ; y otras declaraciones que tienden a demostrar que él permanecía de noche con María Figueroa, en el cuarto de ésta, en dos o más veces a la semana.

"Decimos que es ésta la única prueba con la mayor honestidad profesional. Al decirlo estamos conscientes de que en Puerto Rico repetidamente se ha resuelto que el concubinato a que se refiere nuestro Código Civil es a la condición de vivir juntos un hombre y una mujer, como marido y mujer, sin estar realmente casados. Estamos conscientes, además, de que el concepto de concubinato no puede establecerse con la mera relación de un hombre con una querida. En cuanto a ambos extremos veamos los casos de *Rodríguez* v. *Cruz,* 68 D.P.R. 751, 754; *Bianchi* v. *Sucesión Bianchi,* 67 D.P.R. 594; *Montañez* v. *Rodríguez,* 67 D.P.R. 214; *López* v. *Rodríguez,* 68 D.P.R. 756, 758; *Colón* v. *Sucesión Tristani,* 45 D.P.R. 227, 238; *Medina* v. *Sucesión Bird,* 30 D.P.R. 158; *Estela* v. *Sucesión Medraño,* 51 D.P.R. 548, 554; *Vázquez* v. *De Jesús,* 65 D.P.R. 900, 903 y otros.

"No obstante conocer el alcance jurídico del concepto 'concubinato' nos parece razonable señalar que fué el tribunal infe-

rior el que tuvo oportunidad de determinar, al ver y oír a los testigos de la parte demandante, el que pudo llegar a un juicio más exacto en cuanto al alcance de la declaración de los testigos cuando afirmaban que María Figueroa y Telesforo Díaz mantuvieron relaciones de concubinato durante seis meses a sabiendas del vecindario. Las conclusiones de la corte sobre estos extremos deben ser sostenidas por este Hon. Tribunal."

Conforme dijo este Tribunal en *Vázquez* v. *De Jesús*, 65 D.P.R. 900, 903, citando los casos de *Colón* v. *Sucn. Tristani*, 44 D.P.R. 171 y 45 D.P.R. 227 y *Gerena* v. *Suau*, 36 D.P.R. 170, el concepto de concubinato "en su esencia comprende la relación entre un hombre y una mujer que hacen vida de esposos sin serlo." En este caso la prueba no revela que María Figueroa Fuentes y el demandado hicieran vida de esposos, sino meramente que tuvieron relaciones sexuales. Admito, por tanto, que fué un error del tribunal inferior declarar a la menor demandante hija natural del demandado a base del concubinato de su padres.

En lo que no me es posible convenir es que la prueba que tuvo el tribunal a quo ante sí fué suficiente para demostrar la posesión por la menor del estado de hija natural del demandado, ni en que mera prueba de la paternidad en un caso como el presente justifica la confirmación de la sentencia.

En sus conclusiones de hechos el tribunal sentenciador halló probado que el demandado sostuvo relaciones con María Figueroa Fuentes y que al quedar ésta encinta le instigó a sacarse la criatura mediante un aborto criminal, para lo cual le dió $25. Esa conclusión está claramente sostenida por la evidencia aducida, mas siendo tales relaciones anteriores al nacimiento de la menor, no tienden a probar la posesión del estado de hija natural, sino meramente la paternidad. Constituyen, posiblemente, el punto inicial del primer eslabón de tal estado. En igual sentido debo expresarme sobre el parecido físico de la menor con el demandado, a que el tribunal inferior hizo referencia en sus conclusiones. Tal parecido nada tiene que ver con la posesión de estado,

aunque sí es un factor que puede ser considerado al determinarse el hecho de la paternidad.

También indica el tribunal a quo en sus conclusiones de hechos que el demandado envió a María $10 al hospital con su hermano e insistía "en cumplir sus deberes de padre con la condición de que la demandante se desprendiera de su hija y la entregara a su esposa; y por fin prodigándole caricias y mimos cuando la vió por primera vez en su casa." Sobre los dos últimos extremos, debo hacer constar que las conclusiones no se ajustan estrictamente a la prueba que dicho tribunal tuvo ante sí. Respecto a los $10, la propia madre de la menor declaró que el demandado le mandó ese dinero al hospital con el hermano de ella "porque me hacía falta una faja," indicando Francisco Figueroa Fuentes, tío de la menor que "ella (refiriéndose a su hermana, madre de la niña) estaba en el hospital y él se los mandó (los $10) para que comprara una faja."

En lo referente a que el demandado insistía "en cumplir sus deberes de padre con la condición de que la demandante se desprendiera de su hija y la entregara a su esposa," bastará decir que de la transcripción de evidencia sólo aparece que María Figueroa Fuentes, madre de la menor demandante, declaró que después de haber nacido la niña ella le mandó a decir al demandado que le diera aunque fuera para la leche de ésta y él le contestó "que le mandara la niña *para él reconocerla con su esposa*," mas ella también manifestó que "después de nacer la criatura no le ha pasado un solo centavo para su sostenimiento; que *Rosa Nieves Rosado* detuvo al demandado en una ocasión, cuando la niña tenía dos meses de nacida y le dijo que María le mandaba a decir que "aunque fuera setenta centavos le mandara para la leche de la nena, porque ella estaba operada y no podía trabajar y *él le contestó que por qué no le daba la hija para él y la esposa de él para reconocerla*" y ella le dijo: "imposible que le vaya a entregar la hija para reconocerla la esposa de él;" que repreguntada esta testigo por el demandado si "en al-

guna ocasión él le admitió que la niña era de él," ella contestó que *"él me dijo tan sólo que por qué no le daba la niña María para él y su señora reconocerla,* pero que después no volvimos a hablar más de eso;" que *Jacinta Santiago* llevó a la menor tres domingos consecutivos a la casa del demandado, no encontrando a éste allí en las dos primeras ocasiones, aunque sí en la tercera y que en esa ocasión él cogió la niña, empezó a besarla y la tuvo en los brazos como dos horas; que *"la señora de él me dijo a mí que si María le daba la niña para ellos entonces reconocerla como hija suya,"* y que en la segunda ocasión que visitó a la esposa del demandado ésta le dió leche a la niña. Ésa es toda la prueba que aparece en los autos tendiente a demostrar que la menor demandante disfrutó de la posesión continua del estado de hija natural del demandado.

En el caso de autos la prueba demuestra que el demandado era casado con otra mujer para la época en que tuvo relaciones con la madre de la menor. Como esta última nació en el año 1948 la acción de reconocimiento ha de regirse por la Ley 229 de 12 de mayo de 1942 (pág. 1297), según la misma fué enmendada por la núm. 243 de 12 de mayo de 1945 (pág. 815). Esa Ley dispone en su sección primera que: "Serán hijos naturales todos los hijos nacidos fuera de matrimonio con posterioridad a la fecha de vigencia de esta ley, independientemente de que sus padres hubieren podido o no contraer matrimonio al tiempo de la concepción de dichos hijos." Refiriéndonos a ella dijimos en *Vargas* v. *Jusino,* 71 D.P.R. 389, 392 que: "Esa ley sólo tiene efectos prospectivos y el reconocimiento por ella autorizado, ya fuere voluntario o involuntario, ha de ajustarse a lo provisto por el artículo 125," citando los casos de *Elicier* v. *Sucn. Cautiño,* 70 D.P.R. 432 y *Correa* v. *Sucn. Pizá,* 64 D.P.R. 987.

El artículo 125 a que se alude en el caso de *Elicier* v. *Sucn. Cautiño,* supra, no es otro que el correspondiente del Código Civil, ed. 1930. Éste en lo esencial dispone:

"El padre está obligado a reconocer al hijo natural:

"1.— .    .    .    .    .    .    .    .    .

"2.— Cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia."

Interpretando ese artículo, en innumerables ocasiones, este Tribunal ha resuelto que *la prueba de la posesión de estado ha de ser robusta y convincente.*   *Santiago* v. *Martínez,* 72 .D.P.R. 934, 941; *Vázquez* v. *Sucn. Boyrié,* 52 D.P.R. 856, 859; *Torres* v. *Sucn. Caballero,* 39 D.P.R. 724, 730; *Fontánez* v. *Sucn. Buxó,* 36 D.P.R. 227, 232; *Vega* v. *Sucn. Vega,* 32 D.P.R. 595, 598; *Medina* v. *Sucn. Bird,* 30 D.P.R. 158, 162; *Marrero* v. *Fordham,* 27 D.P.R. 708, 712; *Méndez* v. *Martínez,* 21 D.P.R. 252, 267; *Negueruela* v. *Somohano,* 16 D.P.R. 692, 694.

En *Vargas* v. *Jusino,* supra, este Tribunal dijo a la pág. 394, que "la posesión de estado a que se refiere el Código Civil, consiste en el concepto público en que ha sido tenido el hijo en relación a su padre natural, cuando este concepto se forma por actos directos del mismo padre o de su familia, demostrativos de un verdadero reconocimiento perfectamente voluntario, libre y espontáneo," citando *Fontánez* v. *Sucn. Buxó,* supra, *Vega* v. *Sucn. Vega,* supra y *Montalvo* v. *Montalvo,* 25 D.P.R. 858.   Manifestó además en él a la página 395 que "la mera prueba de la paternidad, aun cuando vaya acompañada de actos de caricias y afectos, regalos, o admisiones de la paternidad, no será bastante para conferir derecho de acción al reconocimiento."

En *Torres* v. *Sucn. Caballero,* supra, se expresó así este Tribunal a la página 730: "Y en todo caso siempre hay que tener en cuenta que *la prueba de los actos de reconocimiento debe ser robusta y convincente,* . . . y que no debe ser de actos aislados sino en tal modo que demuestren la posesión continua del *status* de hijo natural del presunto padre o de su familia, . . .".   Por otra parte, en el de *Desmornes* v. *Herederos de Desmornes,* 13 D.P.R. 18, 27, se dijo: "La

posesión de estado de hijo natural sólo requiere la continua-
ción de hechos que presenten a una persona en la relación
no interrumpida de hijo natural de otra persona, . . .".
Además, en *Colón* v. *Sucn. Tristani*, 44 D.P.R. 171, 181, se
resolvió que "la palabra continuo debe interpretarse en el
sentido de referirse a una serie de actos, a un conjunto de
hechos ejecutados por la persona de quien se reclama el reco-
nocimiento, y que sean bastantes, al examinarlos en globo,
para constituir la posesión del estado de hijo natural."

Un examen somero de la prueba que desfiló ante el tri-
bunal a quo demuestra de manera definitiva que la misma
no fué lo robusta y convincente que a través de un sinnú-
mero de años ha requerido nuestra jurisprudencia. Tampoco
demuestra que los supuestos actos de reconocimiento fueran
ininterrumpidos. Sólo hubo prueba de la paternidad y actos
más bien aislados de reconocimiento. Tales actos aislados o
esporádicos son insuficientes. Veamos:

En adición a las relaciones íntimas del padre de la menor
con la madre de ésta, al hecho de que el demandado sugi-
riera a aquélla que se extrajera la criatura y al parecido
físico existente entre la niña y el demandado, todo lo cual,
como ya he indicado, nada tiene que ver con la posesión de
estado, ¿qué evidencia existe en los autos para demostrar
la supuesta posesión continua del estado de hija natural?
Única y exclusivamente los hechos que, pecando de ampuloso
paso a reseñar brevemente en seguida: (1) el envío de $10
a la madre de la menor, para una faja, inmediatamente des-
pués del alumbramiento; (2) la manifestación de dicha
madre al efecto de que ella le pidió dinero al demandado con
alguien para comprar leche a la niña y que él le "mandó a
decir que le mandara la niña para él reconocerla con su
esposa;" (3) la contestación dada por el demandado a Rosa
Nieves Rosado, al decirle ésta que María le mandaba a pedir
70¢ para la leche de la nena, al efecto de que "por qué no
le daba la hija para él y la esposa de él para reconocerla."
(Esto no es sino una repetición de lo que la madre de la

menor declaró por referencia, que ya hemos reseñado bajo el número (2) de este mismo párrafo) ; y (4) las tres visitas hechas por *Jacinta Santiago* a la casa del demandado, durante las dos primeras de las cuales éste se hallaba ausente y en la última de las cuales el demandado, según concluyó el tribunal a quo, prodigó caricias y mimos a la menor.

Esos actos aislados e interrumpidos no cumplen en forma alguna con los requisitos del estatuto, como tampoco con los de la jurisprudencia constante e ininterrumpida establecida por este Tribunal desde el año 1907 hasta el presente. Por tal motivo mi criterio es que, fundada en la posesión de estado de hija natural, la demanda tampoco ha debido prosperar.

---

Opinión disidente del JUEZ ASOCIADO SEÑOR SIFRE en la cual concurre el JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL.

Discrepo de la opinión del Juez Asociado Sr. Ortiz, porque sin necesidad de invocar o discutir la doctrina que requiere que la prueba de la posesión continua del estado de hijo natural "ha de ser robusta y convincente", la presentada en este caso no justifica que se confirme la sentencia apelada.

En la demanda presentada en este litigio se solicita que se declare que Migdalia es hija natural del demandado, porque (1) nació de padres "que sostuvieron relaciones de concubinato"; (2) el demandado "siempre ha tenido a dicha menor como su hija, tratándola como tal en público y en privado, habiendo provisto a la demandante antes del alumbramiento de dicha menor, con medios para su cuidado y atención y para su alumbramiento", y (3) "Migdalia Figueroa siempre se ha encontrado y se encuentra, en la posesión continua de hija natural del demandado . . . "

Nos dice el mencionado magistrado que la corte sentenciadora erró "al concluir que se había probado que María Figueroa Fuentes y Telesforo Díaz habían vivido juntos en

concubinato", pero invocando la doctrina de que "la apelación se da contra la sentencia y no contra los fundamentos de la opinión", sostiene la que fué dictada, por entender que, "en vista de las circunstancias especiales de este caso, se probó la posesión continua del estado".

El análisis que hace de la prueba está dividido en dos partes. En una estudia la presentada para demostrar la existencia del concubinato y llega a la conclusión de que es insuficiente. En la otra, se refiere a la prueba que según su criterio demuestra "la posesión continua del estado", diciéndonos:

"Examinemos la prueba presentada en este caso. De acuerdo con la prueba presentada por la parte demandante y creída por el tribunal a quo, en cuanto a la posesión de estado en sí, cuando la madre estaba en el hospital, el demandado le envió $10. En otra ocasión, el demandado le pidió a la madre, por conducto de una tercera persona, que le enviara a la niña para él reconocerla conjuntamente con su esposa. La demandante envió a la niña tres veces a casa del demandado y en una de esas tres ocasiones el demandado cogió a la niña en los brazos y la tuvo como dos horas. La esposa del demandado también decía que le dieran la niña a ella y al demandado para ellos reconocerla."

Siendo la opinión del Juez Asociado Sr. Ortiz, con la que estoy enteramente de acuerdo, la de que "un hijo nacido fuera de matrimonio con posterioridad a las fechas de aprobación de las leyes 229 de 1942 y 243 de 1945, tiene que demostrar, en una acción de filiación, que en cuanto a él se ha cumplido con los preceptos y requisitos del artículo 125 del Código Civil", *en este caso con los del inciso 2 de dicho artículo,* no alcanzamos a comprender la razón en que se funda para resolver que Migdalia estuvo en la *posesión continua* del estado de hija natural del demandado.

Manifiesta que "Considerada aisladamente, se podría alegar que esa prueba no es vigorosa ni robusta, bajo la regla que ha venido prevaleciendo en esta jurisdicción, y que ahora descartamos", pero que, "considerando el problema como uno

de preponderancia de la prueba que sea creída por el tribunal inferior, en forma que no sea claramente errónea, y como uno de búsqueda y demostración de la verdad, esa prueba debe ser considerada desde el punto de vista de las circunstancias totales de este caso".

De acuerdo con las disposiciones del inciso 2 del citado artículo 125 del Código Civil, el padre está obligado a reconocer al hijo cuando éste *"se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia"*. (Bastardillas nuestras.) Sin actuar bajo la influencia de la doctrina sobre "la prueba robusta y convincente", acerca de la cual no estoy expresando criterio alguno, por ser innecesario, y aplicando la de la preponderancia de la prueba "a las circunstancias totales de este caso", como lo hace el Juez Ortiz, y dentro de la interpretación más liberal que quiera dársele al adjetivo continuo, es obvio que se incurre en evidente error al considerar que la prueba presentada establece la existencia del requisito de la posesión de estado, a través de los actos que define la ley. No puedo convenir con que una prueba que, según dicho magistrado, *"en cuanto a la posesión de estado en sí"* demuestra, (a) que cuando la madre estaba en el hospital, el demandado le envió $10; (b) que en otra ocasión, éste le pidió a la madre, por conducto de una tercera persona, que le enviara a la niña para él reconocerla conjuntamente con su esposa; (c) que la demandante envió a Migdalia tres veces a casa del demandado, quien en una ocasión la retuvo en sus brazos durante dos horas, y (d) que la esposa del demandado también decía que le diera la niña para reconocerla, justifica la mencionada conclusión.[1]    Es

---

[1] María Figueroa Fuentes declaró que después de salir embarazada el demandado la visitó tres veces, y nunca después de haber nacido Migdalia. De las tres ocasiones en que se dice que Migdalia fué enviada a la casa del demandado, solamente en una, según la propia prueba de la demandante, se encontraba el demandado en su hogar.

Francisco Figueroa Fuentes, hermano de María, testificó que Telesforo Díaz nunca le dijo que Migdalia era hija suya.

errónea la conclusión, como cuestión de derecho, por ser consecuencia de una interpretación equivocada del concepto jurídico de la posesión continua del estado de hijo natural, así como de los actos que se requieren para establecerlo.

La posesión continua de estado debe exteriorizarse por actos que demuestren la intención del padre o de su familia en su caso, de tener como hijo natural al que pretenda ser reconocido, esto es, que descubran la intención de considerarlo y tratarlo como tal. El lapso de tiempo durante el cual han de manifestarse dichos actos no es de vital importancia, siempre que permita que se manifiesten. Lo que si tiene importancia, y fundamentalísima, es que los mismos sean expresivos de perseverancia en exteriorizar la intención de considerar como hijo al que sostiene serlo. Manifiesta el Juez Asociado Sr. Ortiz, que: "Fué corto el período de tiempo en que se pudieron realizar los hechos que daban lugar a la posesión de estado", y que, "debemos considerar que si fueron relativamente pocos los actos del demandado y su familia, *ello posiblemente* se debió a la fecha en que fué radicada la demanda". (Bastardillas nuestras.) La niña nació en 19 de diciembre de 1948 y el pleito fué radicado nueve meses después. Si el supuesto padre tuvo la intención de reconocer a Migdalia como hija natural, pudo haber manifestado esa intención durante ese lapso de tiempo por actos demostrativos de esa voluntad. No lo hizo.

Lo que impide, a mi juicio, el reconocimiento en este caso, no es el elemento tiempo; es la ausencia de aquellos actos que se requieren para que pueda llegarse a la conclusión de

---

A Rosa Nieves Rosado, testigo de la demandante, se le hizo la siguiente pregunta: "¿En alguna ocasión él le admitió que la niña era de él?" Contestó así: "Bueno . . . . Él me dijo tan sólo que por qué no le daba la niña María para él y su señora reconocerla, pero que después no volvimos a hablar más de eso."

En cuanto a actos realizados por la familia del demandado lo único que hemos encontrado en la prueba de la demandante es que la esposa de Telesforo Díaz manifestó en una ocasión que "Si María le daba la niña para ellos entonces reconocerla como hija suya", y que en tres ocasiones mandó buscar a Migdalia y la trató con cariño, dándole leche en una de ellas.

derecho de que concurre el requisito legal de la posesión de estado. Como hemos visto, el propio autor de la opinión los considera "relativamente pocos", y dice que "ello posiblemente se debió a la fecha en que fué radicada la demanda". Especula alrededor de un elemento fundamental de la causa de acción, que no puede ni debe ser objeto de conjeturas.

Entiende el Juez Asociado Sr. Ortiz, que existen ciertas circunstancias en este litigio que justifican su conclusión. Nos dice que, "Criterio esencial en esta clase de casos, es el de evitar reclamaciones fraudulentas en cuanto al *status* de un hijo como miembro de una familia", pero que, "si el propio padre tiene la oportunidad de comparecer, declarar y presentar prueba, quedan reducidas las probabilidades de alegaciones falsas de filiación." No estamos en completo desacuerdo. No hay duda en cuanto a que generalmente el supuesto padre está en mejores condiciones de defenderse que su sucesión. Sin embargo, actos que de por sí, por su propia naturaleza, son insuficientes para probar la causa de acción, no dejan de serlo porque el supuesto padre esté vivo y se defienda. Si el "Criterio . . . en esta clase de casos es el de evitar reclamaciones fraudulentas . . . .", ello no se logra solamente porque medie la circunstancia de que el padre pueda oponerse a la reclamación. Para conseguirlo, es necesario que se requiera de la parte actora que demuestre que tiene derecho al reconocimiento *de acuerdo con la disposición legal que invoca para solicitarlo*, disposición que contiene los requisitos que el legislador ha creído prudente exigir para la protección de todas las partes que puedan estar interesadas en un problema que es siempre complejo y de gran trascendencia social.

Manifiesta mi distinguido colega que, "Otro factor que singulariza este caso es el hecho de que se trata de una hija conocida anteriormente por *adulterina*", añadiendo que, "En esos casos, un padre casado, bajo determinado clima social, no está inclinado a hacer ostentación de su parentesco con respecto a tal clase de hijos". Podemos presumirlo. Dice

además, que "Esa renuencia constituye un factor relevante en cuanto a la posesión continua de estado . . .". Discrepamos. Ese factor no es, ni puede ser "relevante" en cuanto a la posesión continua del estado. Sin embargo, puede tomarlo en consideración el juzgador al ponderar la prueba y al "apreciar en cada caso la índole, trascendencia y alcance de los actos de reconocimiento atribuídos al padre natural o a su familia", y no solamente cuando se trate de un hijo adulterino, sí que también, cuando esté envuelta la filiación de aquellos que no lo sean, porque al tiempo de su concepción los padres pudieran casarse, toda vez que, aunque quizás con menos frecuencia, también en esos casos puede no haber inclinación a hacer ostentación del parentesco. Sentencia Tribunal Supremo de España de 26 de junio de 1903. El factor a que nos referimos, es uno que, dada la condición humana y la realidad social, no es de ignorarse al considerar las circunstancias de cada caso, que son "las que han de determinar el alcance y trascendencia de los actos significativos y demostrativos de la posesión continua del estado de hijo natural", pero en manera alguna puede dársele el valor y efecto de exonerar al hijo adulterino de la obligación de probar actos que serena, imparcial y juiciosamente apreciados, demuestren la posesión continua del estado. Desde el momento en que la demandante solicita el reconocimiento basándose en el inciso 2 del artículo 125 del Código Civil, no debe sancionarse que por un lado lo invoque y por el otro lo descarte, dejando de hacer la demostración que requiere la disposición legal en que funda la causa de acción. Y esta es, a mi juicio, la situación en este caso. Una vez eliminada la teoría del concubinato, como lo hace mi colega, a mi entender correctamente, y por lo tanto, la presunción de la paternidad que emana de esa relación, todo lo que queda es el hecho de que la madre y el supuesto padre de Migdalia tuvieron relaciones sexuales, lo que no crea presunción de paternidad, y ciertos actos, pocos y aislados, totalmente insu-

ficientes para justificar la conclusión a que llega en cuanto a la posesión continua del estado.

Se hace referencia en la opinión a lo expuesto por el ilustre ex Juez Presidente Sr. Del Toro en *Ortiz* v. *Dragoni*, 59 D.P.R. 14, 29, reafirmando que "No deben existir hijos sin padres". ¿Quién querría decir lo contrario? La contestación es obvia. Sin embargo, estamos expresando un criterio que se funda en determinada legislación en vigor cuando nació Migdalia (legislación a la que se concreta ésta opinión), y no podemos caer en el error de permitir que los sentimientos individuales se sobrepongan a las normas del derecho, que en este caso son claras.

Solamente bajo la teoría de que las Leyes 229 de 1942 y 243 de 1945, enmendaron el inciso 4 del artículo 125 del Código Civil en el sentido de autorizar el reconocimiento cuando por cualquier medio de prueba se demuestra la paternidad, podríamos concurrir con el resultado a que llega el Juez Asociado Sr. Ortiz, pero no podemos aceptar esa teoría. (²) Si el legislador hubiera querido autorizar la prueba de la paternidad con cualquier prueba o por cualquier medio, lo hubiera hecho así constar como lo hizo en el Código Civil de 1902. Aun dando a las Leyes 229 y 243 la interpretación más liberal, no podemos adoptar la tesis, sin quebrantar principios jurídicos tradicionalmente reconocidos, de que el referido inciso quedó implícitamente enmendado, eliminándose la palabra "auténtica", o que a ésta pueda dársele una acepción que en derecho no tiene.

El objetivo fundamental de dicha legislación fué "borrar las diferencias existentes entre los hijos nacidos fuera de matrimonio, derivadas de la diferente condición de sus padres y abarcarlos a todos bajo la sola denominación de hijos natura-

---

(²) El inciso 4 del artículo 125 del Código Civil, ed. 1930, lee así: .

"Cuando el hijo pueda presentar cualquier prueba auténtica de su paternidad.

"․          ․          ․          ․          ․          ․          ․          ․          ․         ."

les para todos sus efectos legales,"(³) pero en modo alguno variar las normas establecidas en el Código Civil para obtener el reconocimiento. Este criterio concuerda con el expresado por el Dr. Luis Muñoz Morales en sus Anotaciones al Código Civil de Puerto Rico, Vol. 1, pág. 407. Nos dice que, como consecuencia de la Ley 229 "se entenderán aplicables a los hijos antes clasificados como adulterinos o incestuosos, todos los preceptos del vigente Código Civil aplicables a los otros hijos naturales". El silencio que sobre tales preceptos guardó el legislador no puede dar lugar a otra inferencia que no sea la de que quiso dar y dió por sentado que serían aplicables a todos los hijos nacidos fuera de matrimonio bajo tales leyes, inspiradas, sin duda alguna, en el más alto espíritu de justicia.

(³) Anotaciones al Código Civil, por el Dr. Luis Muñoz Morales, Vol. 1, pág. 401.